706 A.2d 1045

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

## Robin K.A. FICKER.

**Misc. Docket (Subtitle BV) No. 35, Sept. Term, 1994.**
**Misc. Docket (Subtitle BV) No. 15, Sept. Term, 1995.**

Court of Appeals of Maryland.

March 10, 1998.

**16**

Melvin Hirshman, Bar Counsel, and John C. Broderick, Asst. Bar Counsel, for the Attorney Grievance Commission of Maryland, petitioner.

Stanley J. Reed, Bethesda, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

WILNER, Judge.

In two petitions, the Attorney Grievance Commission (AGC), through Bar Counsel, charged Robin K.A. Ficker (Ficker) with several violations of the Maryland Lawyers' Rules of Professional Conduct (MLRPC). The charges emanated from eight complaints filed between 1988 and 1992.

Pursuant to former Maryland Rule BV 9 b (current Rule 16–709), we referred the two petitions to Judge Vincent E. Ferretti, Jr., of the Circuit Court for Montgomery County, to conduct a hearing and make findings of fact and proposed conclusions of law. After hearing evidence over a period of 11 days, Judge Ferretti filed a 45–page opinion in which he made detailed findings of fact and conclusions of law, culminating in a determination that Ficker had, in one manner or another, violated MLRPC Rules 1.1, 1.3, 1.4, 3.4, 5.1, and 8.4. Exceptions were taken by either AGC, Ficker, or both in five of the eight cases.

## DISCUSSION

The complaints against Ficker arise largely from alleged deficiencies in the way he ran his office—principally in the way he kept track of cases and assigned them to associates. In 1990, we reprimanded Ficker for a similar inattention to detail that, as in some of the instant cases, led to a failure to appear in court for two scheduled trials or hearings. *Attorney Griev. Comm'n v. Ficker,* 319 Md. 305, 572 A.2d 501 (1990) (*Ficker I* ).

Ficker was admitted to practice in 1973. In 1986, when his earlier troubles surfaced, he was a solo practitioner who operated out of an office in Bethesda and was assisted by a clerk with no legal training. As we pointed out in *Ficker I,* he maintained no diary or tickler system, and his only schedule of court dates was a large desk calendar. *Id.* at 308, 572 A.2d 501. By 1988, when the current charges began to arise, he had three offices—one in Bethesda, one in College Park, and one in Frederick. His practice was a high-volume one that concentrated on serious traffic violations, often alcohol-related. He estimated that, in 1988–91, he handled between 750 and 850 cases a year. He had cases throughout the State but practiced primarily in Montgomery, Prince George's, and Frederick Counties. To assist him in maintaining that practice, Ficker hired various associates, none of whom, according to this record, remained in his employ very long or consistently. Stephen Allen was employed as Ficker's first associate in June, 1988. In August, 1989, Ficker hired a second associate, Denise Banjavic. Banjavic quit five months later, in January,

1990, and was replaced by B. Edward McClellan and Thomas Mooney. A month later, Allen left, after 19 months; he was replaced, in March, 1990, by David Saslaw and Noreen Nelligan. McClellan left in February, 1991 (13 months); Mooney left in March, 1992 (26 months). Saslaw and Nelligan left for a time but later returned. Ficker apparently did not have a secretary but instead employed one non-lawyer assistant. His first assistant was Art Williams; after Mr. Williams, who was then in his seventies, suffered a stroke in 1989, Ficker employed Alex Burfield, a law student, to replace him.

Both Allen and McClellan testified as to the way in which Ficker assigned cases and responsibility. Allen testified basically that Ficker would interview most of the clients and would assign cases to himself and the associates the day before trial. The attorneys assigned the cases would often have never seen the file before and, in 99% of the cases, would never have met the client. Allen said that, sometimes when he got to court, he would have to call out the client's name in order to make the introduction. Often, the file did not contain a police report, and it was not until he got to court that, through discussions with the prosecutor or police officer, he would learn the facts of the case. He said, in explaining why he ultimately left Ficker's employ:

> "[W ]e had no control over where we were going to go I would say ninety percent of the time, whether it was going to be a trial the next day, how many different courts we had to be in. It was pretty hectic. . . . I mean the pace was tremendous and you were running all over the state morning and afternoon. If you got stuck in a court in one county, you might have had two or three cases in another county in the afternoon that you wouldn't know how to get there if you got stuck in a trial or something happened; so you know we were always continuing cases or asking for jury trials in cases to meet the deadline, to meet the other court dates."

Allen explained that cases set in for morning hearings were specifically assigned, but that afternoon cases would be handled by whomever was available:

"Everyone would handle cases in the morning, call in when they were done, and they would be advised because there wasn't another attorney to go to that case. So whoever finished first would call in. . . . But whenever there were more cases than attorneys, all attorneys would be assigned one area to go to and everyone called in when they were done, and the first person who was done first or who was available would be sent off. I mean that happened continuously."

He added that his appearance and that of Ficker were often entered jointly, with neither one knowing who would end up actually representing the client.

Mr. McClellan said that he occasionally received files a week in advance but sometimes did not receive them until the day before trial. He confirmed that attorneys were assigned on a geographic basis and that whoever finished first would handle the "overflow." It appears that Burfield (and before him Williams) in addition to his other duties, was essentially the dispatcher. As attorneys would call in, Burfield would inform them of where to go next, with or without a file. That situation apparently prevailed until March, 1990, when, as the result of Ficker being found in contempt of court for failing to appear in the *Jordan* case, described below, Ficker brought in another attorney, Thomas Heeney, as a mentor and made a number of changes in his office procedures. Those changes included the hiring of an additional attorney, Ms. Nelligan, and a secretary, the purchase of a computer, the inauguration of weekly meetings between Ficker and his associates, and the development of two geographically-based calendars, one kept by Ficker and the other by Burfield.

Saslaw agreed that things were "hectic" when he began employment in March, 1990 but said that they got better after the *Jordan* episode. He claimed that, in addition to a master calendar kept by Burfield, each of the lawyers had their own calendar of cases. The lawyers were assigned geographically and were able to get files earlier, and he had more time to review cases. There was other evidence, however, that the

system of dual calendars did not last longer than a few months.

With this general background, we shall turn to the eight complaints made against Ficker.

### (1) *Theo Dylewski*

In October, 1987, Ms. Dylewski met Ficker in the lobby of the Holiday Inn in Frederick [1] and retained him to represent her in connection with a charge of driving while intoxicated. She paid him $100 toward a $650 fee but received neither a receipt nor a written retainer agreement. Trial was scheduled in the District Court in Frederick County for March 2, 1988; Ficker formally entered his appearance in November, 1987.

Ms. Dylewski testified before the AGC Inquiry Panel that she called Ficker's office in late January or early February to advise that she would be in Florida on March 2 and to request that the trial be postponed. She thought that she spoke to Ficker himself and that he told her a postponement would not be a problem, but that, if it were, he would let her know. Ficker said that he had no recollection of speaking with Ms. Dylewski about a postponement. He testified that, a day or two before the trial date, his assistant Art Williams told him that Ms. Dylewski had called and said that she wanted to be in Florida on the day of trial. He had no recollection of speaking with Ms. Dylewski at that point but said that he "probably" tried to reach her. Mr. Williams, who was 81 when he testified in this matter in 1995, said that he had no recollection of Ms. Dylewski but asserted that he would never, on his own, advise a client of Ficker's that a postponement would be granted or that it was all right not to show up for trial. He acknowledged that one of his duties was to answer the telephone and take messages, and that, if a client called and said that she needed a postponement, he would tell Ficker about it.

---

1. Ficker explained that, in an effort to be more accessible to the public, he often met and conducted business with clients and prospective clients in hotel lobbies and parking lots, rather than in his office.

Ficker appeared in court on the trial date and orally requested a continuance, informing the court that his employee had informed him that his client wanted to be in Florida. He said that he did not file a motion in advance because (1) he had experienced difficulty in getting postponements in the District Court in Frederick, and (2) he had no idea of "why she wasn't going to be in court or indeed if it was a sure thing that she wasn't going to be in court." When the prosecutor objected to a continuance, the court denied the request and issued a bench warrant for Ms. Dylewski. Ficker said that, upon returning to his office, he called the number he had for Ms. Dylewski and left a message with "someone" that a bench warrant had been issued.

Ms. Dylewski testified that her first awareness of the warrant was on April 8, after she had returned from Florida, when her husband informed her that the State Police had been to her home to serve the warrant. She called Ficker, who advised her to surrender herself. Upon the advice of a District Court clerk, she wrote a letter to the judge explaining the circumstances, and, eventually, the warrant was withdrawn. Ms. Dylewski later retained other counsel. Ficker never refunded the $100.

AGC charged Ficker with violations of MLRPC Rules 1.1 (requiring the provision of competent representation), 1.3 (requiring a lawyer to act with reasonable diligence and promptness), 1.4 (requiring a lawyer to keep a client reasonably informed about the status of a matter), 5.3 (requiring a lawyer to provide proper supervision over non-lawyer assistants), and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

On the evidence presented, Judge Ferretti said that he could not find by clear and convincing evidence that Ms. Dylewski spoke personally with Ficker when she called his office in January or February. He did find, however, that Ficker was informed of her request for a continuance at least three or four days before the scheduled trial date. Judge Ferretti concluded that, as "a written request for a continu-

ance might have been consented to by the State," by failing to file a motion for continuance at that time, Ficker did not act with reasonable diligence and promptness in representing Ms. Dylewski, in violation of MLRPC 1.3. He concluded further that, in failing to communicate with his client in a reasonably prompt manner, he also violated MLRPC 1.4(a) and 1.4(b). The court found no violation of MLRPC Rule 1.1 and no violations of MLRPC Rules 5.3 or 8.4(c), by not having a better management system in place or by not properly supervising Mr. Williams.

Ficker filed exceptions to the court's findings and conclusions with respect to Rules 1.3 and 1.4. AGC excepted to the court's failure to find a violation of Rule 5.3. Ficker's exceptions hinge, essentially, on the assertion that there was no clear and convincing evidence that he was aware of Ms. Dylewski's plans or request until a day or two before trial and that, in light of that circumstance, it was reasonable for him to appear in court and move orally for a continuance rather than attempt to file a written motion. Judge Ferretti's finding that Ficker was aware of Ms. Dylewski's situation three or four days before trial is not supported by substantial evidence, he claims, and is therefore clearly erroneous. AGC, on the other hand, urges that, if Ficker did not know of his client's situation until three or four days before trial, that was because he did not have in place proper measures to assure that Mr. Williams would do his job properly, and that that failure constitutes a violation of Rule 5.3.

 Ficker's exceptions have merit and will therefore be sustained. With respect to Ficker's knowledge, the evidence before Judge Ferretti would have allowed either of two findings: (1) that Ms. Dylewski in fact spoke with Ficker in late January or early February and that he therefore knew at that point that she needed a postponement, or (2) that he did not learn of her situation until a day or two before trial. The one finding that is not allowed by the evidence is the one that Judge Ferretti made—that Ficker learned of the situation three or four days before trial. There was no evidence to

support that finding. Judge Ferretti found insufficient evidence to conclude that Ms. Dylewski spoke personally with Ficker, thus leaving as the only viable alternative a conclusion that he did not become aware of her situation until the very eve of trial.

On that premise, we do not believe (1) that, given his prior experiences in seeking postponements, it was unreasonable for Ficker to choose to appear in court and explain the situation personally to the judge, rather than filing a written motion, or (2) that, as a practical matter, Ficker would have been able to contact his client and assure her appearance in court. With respect to the postponement, it is not at all clear that a written motion filed a day or two before trial would have been successful or that the prosecutor would have consented to it. Simple courtesy and a decent respect for a fellow lawyer would, of course, have dictated that Ficker, even at that late date, call the State's Attorney's Office to alert them to the situation and to his intent to seek a postponement, but he has not been charged with being discourteous. As to communicating with his client, she was in Florida; he did not know where to reach her; and, when he called the one Maryland number he had upon his return from court, he had to leave a message with someone else.

We find no merit in AGC's exception with respect to MLRPC Rule 5.3 in this matter. That rule provides, in relevant part, that a lawyer having direct supervisory authority over a non-lawyer shall make reasonable efforts to ensure that the non-lawyer's conduct is compatible with the professional obligations of the lawyer. AGC notes that, if Ms. Dylewski did not talk to Ficker, she spoke with Mr. Williams, among whose duties were answering the telephone and taking messages. Its position is that Ficker should have had in place some procedure to assure that Williams would, in a timely manner, relay any message he received from Ms. Dylewski. Judge Ferretti found that no tickler or calendaring system would have prevented the lapse in question. It was simply a matter of Mr. Williams apparently not timely relaying a call,

which he acknowledged was his duty to do. There is no evidence in this record that that was a persistent problem with respect to Mr. Williams, and we are not prepared to conclude, on this record, that one missed communication, even though significant, constitutes a violation of MLRPC Rule 5.3.

### (2) *Dave R. Miller—Burfield*

Mr. Miller was charged with an alcohol-related offense in the spring of 1989. In response to a written solicitation from Ficker, he contacted Ficker's office on June 17, 1989. Mr. Burfield, who had replaced Mr. Williams as Ficker's assistant, met Miller on the parking lot of the Holiday Inn in Frederick. Ficker was in the vicinity earlier but apparently did not remain to meet with Mr. Miller. AGC's complaint arose from the fact that Burfield, on his own, charged Miller $60 for the initial interview and took a check for $60 from Miller, payable to Burfield. There was evidence that Burfield had done that with respect to other clients as well. In its petition, AGC alleged that Burfield "regularly and repeatedly interviewed and advised [Ficker's] clients, took money from new clients on his own behalf and misled and or allowed [Ficker's] clients to believe he was an attorney." AGC further claimed that "[d]espite [Ficker's] knowledge of Mr. Burfield's activities, he took no remedial action and otherwise failed to supervise him." That lapse, it alleged, constituted a violation of MLRPC Rules 5.3 (failure to supervise a non-lawyer employee) and 8.4(d) (conduct prejudicial to the administration of justice).

Judge Ferretti found no violation of either rule. He concluded that (1) at the time of the Miller matter, Ficker was unaware of what Burfield was doing, and (2) when, in July, 1989, Ficker discovered that conduct, he reprimanded Burfield, put an immediate stop to the practice, refunded the money Burfield had charged the various clients, and docked Burfield's pay for the cost of the refund. Because Miller had stopped payment on his check, there was no need for Ficker to reimburse him. Judge Ferretti found that, although Burfield did regularly interview Ficker's clients, there was no ethical bar to a non-lawyer interviewing clients. Judge Ferretti

further found that Burfield did not render any legal advice. Neither party has excepted to the findings or conclusions in this matter.

### (3) *Timothy Jordan*

The *Jordan* case arose from a failure to appear at trial, but it implicated as well failures in delegation and assignment. In May, 1989, following a one-car accident in which he lost control of his car and hit a tree, Jordan was charged, in Washington County, with driving while intoxicated, driving under the influence, failing to wear a seat belt, and speeding. In response to a mailed solicitation from Ficker, Jordan met with Burfield on the parking lot of a Holiday Inn in Frederick on June 17, 1989, retained Ficker to represent him for a fee of $999, and gave Burfield $100 toward the fee. Shortly thereafter, Ficker entered his appearance on behalf of Jordan and prayed a jury trial. That, of course, caused the case to be transferred to the Circuit Court for Washington County.

Ficker was made aware that Jordan had previously been convicted of driving while intoxicated, in 1982, resulting in a suspended sentence in favor of probation, and that he was then facing a separate driving while intoxicated charge in Frederick County. In his testimony, Ficker acknowledged that because Jordan had a second and third offense, he was "looking at lots of jail time, unless we knocked out one of the cases" and that it was important "to know what the facts were to assess which of the cases, if not both of them, were winnable in a trial because it is the third offense where they really hammer you." The record before us does not reveal when the Frederick County case was tried. Ficker represented Jordan in that case and was pleased that his client escaped incarceration.

Trial in the Washington County case was scheduled for March 6, 1990. On March 5, a court clerk called Ficker's office twice to confirm the date and to inquire whether Ficker intended to insist on a jury. Someone from Ficker's office called back and informed the clerk that a jury would be required. Despite the notice and the fact that Jordan himself

was in court, no one appeared from Ficker's office when the case was called at about 9:45 a.m. As a result, after a later hearing, Ficker was held in contempt of court and fined $1,000.[2]

The *Jordan* case was assigned to Mr. Saslaw, who had begun employment that week and had never tried a jury case, although Ficker said that he was unaware of that lack of jury experience and believed that Saslaw was competent to try the case. Saslaw was not given the file until March 5, the day before trial. In addition to the *Jordan* case, Saslaw had two cases to try in the District Court in Frederick. Ficker said that he called Saslaw that evening and discussed the case with him, although their recollections differed as to the extent of the conversation. Saslaw said that it consumed only three to five minutes; Ficker said that he discussed the facts and assumed that Saslaw would be able to handle the matter. Ficker regarded it as a "simple case." There would be just the police officer and Jordan and the only question was "could they prove the guy was driving." That defense, presumably, was based on the fact that, after Jordan had driven his car off the road and into a tree, he left the scene and went to a nearby hospital for treatment, and that the police did not catch up with him until he was at the hospital. The police report, however, indicated a strong odor of alcohol in the car and emanating from Jordan. Jordan refused to take the breathalyzer test. Overlooked by Ficker—probably because, according to Jordan, the matter was never discussed between them—was the fact that Jordan's face "was imprinted" in the windshield of the car. His hair was stuck to the windshield, and he had glass fragments on him when he met the officer at the hospital.

It appears that Saslaw misunderstood what he was expected to do. He admitted that Ficker had told him that it was a jury trial case, and, indeed, the file reflected that to be so, yet

---

2. Upon motion for reconsideration, the court struck the contempt finding and Ficker donated the $1,000 and costs to the Washington County Library.

Saslaw somehow was under the impression that the case was still in the District Court and that his mission was simply to request a jury trial. When he arrived at the District Court, he attempted to locate the *Jordan* case on the District Court docket, and, finding no record of the case in that court, he proceeded to try his two District Court cases and then returned to the office. It was not until after 4:30 p.m. that he learned that the case was in circuit court and that no one had appeared. In "testimony" given at Ficker's contempt hearing, Saslaw took full responsibility for the error, attributing it to a "rookie mistake." Jordan was eventually tried, convicted, and given a sentence of one year, suspended in favor of three years probation, and a fine.

On these facts, Ficker was charged with violating MLRPC Rules 1.1, 1.3, 3.4, 5.1, and 8.4(d). Judge Ferretti found no violation of Rules 1.3, 3.4, or 8.4. He did, however, find a violation of Rules 1.1 and 5.1. Given the nature of Ficker's practice, Judge Ferretti held that Ficker had an obligation to determine the extent of Saslaw's prior experience in handling DWI jury trials before assigning him such a case. He declared "that Mr. Ficker did not inquire into or ascertain Mr. Saslaw's experience in jury trials; that Mr. Saslaw did not expect to try a jury trial; that Mr. Ficker did not discuss a jury trial in depth in the Jordan case with Mr. Saslaw; that Mr. Ficker did not prepare Mr. Saslaw nor require Mr. Saslaw to prepare for a jury trial." He found that "there was no procedure in place for checking on the Jordan case in the Hagerstown Circuit Court." From this, Judge Ferretti concluded that Ficker had violated MLRPC Rule 5.1 "by not making reasonable efforts to insure that a subordinate lawyer could provide competent representation to the client based upon adequate legal knowledge, skill and preparation reasonably necessary for the proposed representation...." That failure, the judge concluded, also constituted a violation of Rule 1.1.

Ficker filed no exceptions to Judge Ferretti's findings and conclusions in *Jordan.* AGC excepted to his failure to find a violation of Rules 3.4(c) and 8.4(d). Liability under Rule

3.4(c), it urges, stems from Ficker's failure to have in place a system or procedure "to check on a particular matter," and that, as a result, Ficker is as responsible as Saslaw for Saslaw's failure to appear. It seeks to fit under Rule 3.4(c) as well the fact that Saslaw was, in fact, unprepared to try the *Jordan* case in any event, due to Ficker's practice of assigning cases the day before trial. Ficker's responsibility for Saslaw's failings suffices to constitute a violation of Rule 8.4(d) as well, in its view.

■ We shall overrule AGC's exceptions. Although we do not absolutely reject the notion that a supervising lawyer may be responsible under Rule 3.4 or 8.4 when a subordinate fails to appear in court for a scheduled hearing or appears with insufficient knowledge to provide adequate representation, we believe that, on this record, Judge Ferretti's analysis of the problem was essentially correct—responsibility is more appropriately placed under Rule 5.1. Saslaw was an admitted novice in this area of law, which, according to Ficker, constituted 98% of his practice. If he intended to have Saslaw jump immediately into trying jury cases involving charges of driving while intoxicated, he had an obligation to determine whether Saslaw was, in fact, sufficiently trained or experienced to provide competent representation in that area. He had no right merely to assume such competence, as he admittedly did.

Moreover, and, indeed, more important, especially when dealing with a novice, it was wholly and inexcusably inappropriate for him to assign such cases the day before trial, with a minimum of instruction. Saslaw had never met the client, had never talked to the officer, knew nothing about the case, and obviously was unaware even that the case was to be tried. Moreover, this was not, as Ficker so cavalierly assumed, a simple case. According to his own client, there was ample evidence that Jordan had been driving the car, and this was his second or third offense, for which a jail sentence was a distinct possibility. Saslaw's appearance had not been entered in the case, and the client was fully expecting Ficker to appear on his behalf. The deficiency here was in failing to supervise

the associates, such as Saslaw, exacerbated by the manner in which cases were assigned to them.

### (4) *Elmer Klein*

This charge also emanated from a failure to appear. Klein was charged with an alcohol-related offense. As this was a second offense, Klein prayed a jury trial, which was scheduled to take place in the Circuit Court for Anne Arundel County, before Judge Robert Heller, at 9:30 a.m. on February 21, 1990. Three lawyers from Ficker's office—Ficker and associates Stephen Allen and Denise Banjavic—entered their appearances. By the time of trial, Banjavic had left Ficker's employ. When the case was called, no one from Ficker's office was present. Someone on Judge Heller's staff called Ficker's office and spoke to Burfield, who advised that Ficker was in District Court in Frederick and that he (Burfield) had informed the circuit court that Ficker would be late and should arrive around 11:00. When Ficker did not arrive by 11:00, another call was made. Burfield reported that Ficker was still in Frederick, but that another lawyer would be dispatched. Around noon, Mr. McClellan, appeared. McClellan said that he had been in court in Prince George's County, that he had never met Mr. Klein, did not have a file, and knew nothing about the case.

After a break for lunch, Klein told Judge Heller that he wanted to proceed with Mr. McClellan. As part of an apparent plea bargain, Klein pled guilty to driving under the influence, in return for which the prosecutor nol prossed the more serious charge of driving while intoxicated. Klein was sentenced to 60 days in jail, which was suspended in favor of probation and a fine. Later in the afternoon, Judge Heller spoke with Ficker, who said that he had three cases in Frederick County and, according to Judge Heller, "seemed cavalier about the entire matter." Ficker testified that he apologized to Judge Heller.

As a result of Judge Heller's complaint, Ficker was charged with violating MLRPC Rules 1.3 (reasonable diligence), 3.4(c) (knowingly disobeying an obligation under the rules of a

tribunal), 5.1 (supervising lawyers in the firm), and 8.4(d) (conduct prejudicial to the administration of justice).

There was a great deal of evidence taken with respect to the Klein case. Ficker had no recollection of assigning the case. He stated that on the schedule for February 21, 1990 were three cases in Frederick, several people to be met in Frederick (including two prospective clients), three clients to be met in Rockville, a proceeding identified only as an "NBA" in Rockville,[3] a case in Rockville, three matters in Prince George's County, and the Klein case in Annapolis. It is evident that Ficker handled the matters in Frederick. McClellan was assigned to the cases in Upper Marlboro. Allen was sent to District Court in Hyattsville to obtain a continuance in a case. He claimed that he was not assigned the *Klein* case—that no one was—although he said that he may have driven to Annapolis on February 20 to file a request for postponement in that case. This was one of those cases, he said, that the first lawyer who finished his morning docket would handle. He called the office after completing his assignment in Hyattsville and Burfield told him that McClellan had been sent to Annapolis. There was other evidence that Allen was, in fact, assigned the case but thought it had been postponed. There was no evidence that he had the file with him on February 21.

From all of the evidence presented, Judge Ferretti found that Allen was, in fact, assigned the *Klein* case and that, as a result, AGC's charges were unfounded. Because the case was assigned to Allen, and because Ficker did nothing to ratify Allen's failure to appear, the judge found no violation of MLRPC Rule 5.1. Nor, he continued, did Allen's failure to appear constitute a violation by Ficker of Rule 1.3 (acting with reasonable diligence), Rule 3.4 (knowingly disobeying an obligation owed to a tribunal), or Rule 8.4 (conduct prejudicial to

---

3. We may be speculating, but it is possible that "NBA" is a typographical error and that what is meant is "MVA," referring to an administrative hearing before the Motor Vehicle Administration on a license suspension or revocation. In the *Jordan* case, discussed above, there is a reference to "MBA" hearings.

the administration of justice). The underlying basis of his conclusions was that Allen's failure to appear was not the product of any conduct by Ficker personally or the result of procedures that he put in place.

AGC has excepted to those findings and conclusions. As to Rule 5.1, it argues that the court reached inconsistent conclusions. In the *Jordan* case, discussed above, which involved a failure to appear in the Circuit Court for Frederick County on March 6, 1990, Judge Ferretti found that the failure arose from the lack of any procedure designed to avoid such lapses, and AGC maintains that the same finding should be made with respect to the *Klein* case. Such a finding, it continues, would establish a violation of Rules 3.4 and 8.4 as well. More specifically, it contends that the evidence showed that Ficker did not assign the case to Allen in a timely and proper manner. *Klein* was a serious case—a third offender to be tried before a jury—and neither Allen nor McClellan were prepared to try it.

We shall deny AGC's exceptions with respect to Rules 1.3., 3.4, and 8.4, but shall sustain the exception as to Rule 5.1. On the evidence before him, Judge Ferretti's finding that the *Klein* case had been assigned to Mr. Allen was not clearly erroneous. It was, therefore, Allen's responsibility to be present. Ficker in no way ratified Allen's failure to appear. He did not fail to act with reasonable diligence or to obey an obligation owed to the circuit court, and he therefore did not engage in conduct prejudicial to the administration of justice.

We do not agree, however, that there was no violation of Rule 5.1. Section (b) of that rule requires a lawyer having supervisory authority over another lawyer to "make reasonable efforts to ensure that the other lawyer conforms to the rules of professional conduct," and section (c) makes the supervisory lawyer responsible for the subordinate's violation if the supervising lawyer "knows of the conduct at a time when its consequences can be avoided or mitigated but failed to take reasonable remedial action."

As AGC points out, the *Klein* case cannot be viewed in a vacuum. Although what happened here is somewhat different from what occurred in *Jordan*, the two cases, together, demonstrate the gross deficiencies in Ficker's operation, deficiencies that almost guaranteed both kinds of problems. In *Jordan*, the problem was in assigning cases at the last minute to a novice attorney not capable, under the circumstances, of providing competent representation. Here, the problem was in assigning too many cases to too few lawyers, mostly at the last minute. Accepting Judge Ferretti's finding that the case was, in fact, assigned to Allen, it becomes evident that Allen was scheduled by Ficker to be in two courts, in different counties, at the same time. When the problem was brought to the attention of Burfield—the person authorized by Ficker to deal with it—it was "resolved" by sending over to try the case a lawyer who knew nothing about the case, whose appearance had not even been entered, who had not ever met the client, and who did not even have the file. However bright and experienced the lawyer may be, that kind of system is not conducive to providing competent representation. When imposing it on young, inexperienced lawyers, the problem becomes exponentially worse.

Ficker essentially operated his practice like a taxicab company, with Williams or Burfield as the dispatcher. What he apparently, and inexcusably, failed to realize is that, while perhaps any competent taxi driver can transport a passenger from one point to another on a moment's notice, legal services cannot routinely be dispensed on that basis with an acceptable degree of competence. As the direct result of Ficker's practices, not only was the court inconvenienced but Klein was faced with the unacceptable prospect of either falling on his sword or going to trial with a lawyer he never hired and who knew little or nothing about his case.

### (5) *Dewayne Phillips*

The complaint in the Phillips case was viewed by Judge Ferretti as basically a fee dispute, arising from the fact that Phillips discharged Ficker after having paid him $1,000 toward

a $1,500 fee and before trial. AGC alleged violations of MLRPC Rules 1.3, 1.4, 1.5, 1.16, 5.1, 5.3, and 8.4. Judge Ferretti found none of those rules violated, and, by failing to take exceptions, AGC has accepted that result.

### (6) *Roger Ruby*

Ruby was charged with driving while intoxicated. Ficker represented him in the District Court where, on May 25, 1990, he pled guilty. The judge postponed sentencing until July 17, 1990, and directed Ficker to arrange for Ruby to be evaluated by the Montgomery County Pre–Release Center (PRC) to determine his eligibility for a special treatment program for repeat offenders, identified in the record as the C.A.T.S. program. At the time, the PRC would not actually schedule an interview unless (1) the attorney called to "schedule an interview," and (2) the client then called personally to schedule an appointment. There was some dispute about the lead time necessary for PRC to make a screening report for sentencing purposes; Judge Ferretti found that the lead time was between four and six weeks.

It is undisputed, and Judge Ferretti found, that, immediately upon leaving court, with his client still with him, Ficker attempted to contact the PRC but was unsuccessful. Ficker claimed that Ruby was due at his home to do some landscaping work the following Friday—June 1, 1990—and decided to call again at that time. Unfortunately, Ruby did not show up, and so the call was never made. Ficker said that he did not call to schedule an appointment because he did not think that Ruby would keep any appointment that might be made. He stated that he called Ruby a number of times and left messages. On July 12, with still no appointment set, Ficker had Burfield call PRC to schedule an appointment, and one was scheduled for July 24. Being unable to proceed on July 17, the judge postponed sentencing until July 26. Ruby apparently attempted to keep his appointment with PRC, but got lost on the way. He showed up in court on July 26 under the influence of alcohol. The judge denied another request for

postponement and imposed a sentence of 179 days incarceration, without a PRC recommendation.

For failing to call PRC in a timely manner, AGC charged Ficker with violations of MLRPC Rules 1.3, 3.4, and 8.4(d). Judge Ferretti found that Ficker had a "continuing obligation to attempt to contact the PRC in a timely fashion (*i.e.*, at least thirty (30) days prior to the sentencing date)," and that had he fulfilled that obligation, the judge would have been able to proceed with sentencing on July 17 even if Ruby had missed any appointment scheduled for him. On that premise, the judge found all three rules violated.

Ficker has excepted to those rulings, contending that there was really nothing more that he could have done to assure a timely screening of his client. We find no merit in those exceptions. A screener from PRC testified that there was, in 1990, a 30–day lag time for the screening process and that PRC would not commence the process until an attorney called. When an attorney called, PRC would begin collecting information but would not schedule a client interview until the client called. PRC allowed two weeks for a client to call; because of pending appointments, it could not schedule an interview within that period in any event. When Ficker's office called, on July 12, PRC was unaware that a sentencing date of July 17 had been scheduled. After Ruby himself called, it scheduled an interview for July 24. PRC did not learn that sentencing had been scheduled for July 17 until the judge called that day to inquire why a report had not been prepared.

■ Ficker acknowledged his awareness of PRC's backlog and requirements. He knew that there was not much leeway if a report was to be rendered by July 17, and for him to make no effort to start the process with PRC until July 12 was to guarantee that a report would not be forthcoming by the date set for sentencing. It was not the case that an earlier call from him would have been futile. As noted, not only would his call have allowed PRC to begin gathering information necessary for a report, but no interview would have been scheduled for Ruby without that call. His lack of diligence did, indeed,

constitute a violation of MLRPC Rule 1.3. It also constituted a knowing disobedience of the judge's instruction to have his client evaluated in time for sentencing on July 17, in violation of Rule 3.4(c).

### (7) *Ronald Furey*

Like the *Phillips* case, the *Furey* complaint is essentially a fee dispute. Ficker agreed to represent Furey in two related matters—in District Court and before the Motor Vehicle Administration. He charged a fee of $199 for the administrative hearing and a fee of $699 for the District Court case. Furey made an initial payment of $450, and Ficker and Nelligan entered their appearances. The MVA hearing was scheduled for 9:00 a.m. on February 5, 1991. Somehow, Ficker noted on his calendar that the hearing was scheduled for 1:00, so he did not appear at the proper time. After a call from Furey, he showed up at 10:00 and represented Furey, apparently successfully. Furey then discharged Ficker, obtained other counsel for the District Court proceeding, and demanded a refund. There is some dispute whether Ficker initially agreed to a refund, but ultimately he refused. AGC charged him with violating MLRPC Rules 1.3, 1.5(a), 1.16, and 8.4. Judge Ferretti found no violation of any of those rules, and AGC has accepted that decision.

### (8) *Stuart Schulze*

In August, 1991, Schulze was arrested while returning with his wife from a party and charged with driving while intoxicated, driving under the influence of alcohol, driving with an expired license, and speeding. Trial on the lesser traffic charges was set for December 18, 1991; trial on the alcohol-related charges was scheduled for January 28, 1992. In November, following receipt of a targeted solicitation from Ficker, Schulze called Ficker and arranged to meet him at the latter's Bethesda office. During that first conversation, according to Ficker, Schulze answered some standard questions about the event. From those answers, including Schulze's assertion that he had not been drinking, Ficker anticipated

that the case would have to proceed to trial—that there would likely be no plea bargain to a charge of driving while intoxicated when the client claimed that he had not had anything to drink.

When Schulze arrived at the appointed time, Ficker was not there, but Schulze discussed the case with Burfield and filled out a brief "Client Information Sheet." Burfield gave him a retainer agreement, which Schulze took with him and later returned, along with a four-and-a-half page statement giving his version of the facts. In that statement, Schulze claimed that he had not been drinking, that the arresting officer had been nasty and abusive to both him and his wife, and that two other officers at the police station witnessed some of the arresting officer's inappropriate behavior. He did not identify the two officers or give the names of any other guests at the party who might be able to testify as to his sobriety. It is nonetheless clear from the statement that at least Schulze's wife and possibly the two officers would or could be important defense witnesses. Significantly, the statement revealed that Schulze had refused to take a breathalyzer test. It also noted that Schulze had a CAT scan scheduled the next day, although it did not indicate why he was in need of such a procedure. At some point, Schulze left with Burfield the two court notices and told Burfield that he wanted the charges consolidated. Burfield responded that Ficker would see to it. Schulze made a $300 deposit against a $750 fee, and Ficker entered his appearance in the District Court.

No motion to consolidate was ever filed. Although Ficker's office was notified of the December 18 trial date on the lesser charges and Mr. Mooney was assigned the case, no one appeared in court, and, as a result, Schulze received a notice from the Motor Vehicle Administration that his license was in jeopardy. Receiving what he believed was an unsatisfactory explanation from Ficker, Schulze arranged with the court for a new trial date but eventually decided to pay the tickets. Although Judge Ferretti discredited much of Schulze's testimony concerning conversations he had with Mooney and Ficker, the judge made no finding as to why no one from Ficker's

office appeared on December 18, despite knowledge that the tickets were set for trial that day and that no motion to consolidate had been filed, and despite the fact that the case was listed on Ficker's calendar for that day.[4]

Schulze spoke with Ficker and Mooney on January 27—the evening before scheduled trial on the alcohol-related offenses. According to Schulze, Ficker was unaware that Schulze had declined to take the breathalyzer test, notwithstanding that that fact was revealed in the typed statement he had left with Burfield. Ficker said that he would "talk to people tomorrow morning" and then decide on their strategy. As the two had never met, Ficker instructed Schulze to be in court by 9:00 and that "I'll be in the hall calling out your name." Based on his conversation with Mooney, Schulze expected Ficker to pray a jury trial. In fact, Ficker did not appear in court until after the docket was called and court was in session. During a recess, Ficker spoke with the police officer who had stopped Schulze and was informed by him that (1) Schulze had been drinking, and (2) it was Schulze and his wife who were abusive and uncooperative. The other two officers were also in court and, according to Ficker, they laughed when he posited that his client had not been drinking. Ficker told Schulze that he was prepared to go to trial but discussed the option of trying the case before a jury in circuit court. He told Schulze that if the case were transferred to circuit court, there would be an additional fee of $599. Schulze agreed to a jury trial, signed a new retainer agreement, and gave Ficker a check for $400.

Ficker prayed a jury trial, and the case was transferred to the circuit court. Unfortunately, through no fault of Ficker's, the clerk failed to enter his appearance and instead entered

4. In testimony in a collateral case, in which Ficker sued Schulze's wife for stopping payment on a check, Ficker claimed that Mooney was designated to represent Schulze on the lesser tickets and that Mooney did not appear because Schulze had decided to pay those tickets. That does not square with Ficker's testimony in this matter. Before Judge Ferretti, he said that, although he "thought the tickets had been paid," he was made aware that Schulze did not decide to pay those tickets until February, 1992. Mooney did not testify with respect to this matter.

the appearance of the public defender. As a result of this mix-up, notice of a readiness conference scheduled for April 16, 1992 and a trial date of June 1, 1992, was sent to the public defender, rather than Ficker. Rather than informing the court of the mistake, which would have been the courteous thing to do, the public defender simply discarded the notice. Accordingly, Ficker was never notified of either the conference or the trial date. As a result, no one appeared when the case was called on June 1, and as a result of that, a warrant was issued for Schulze. Schulze was informed of the warrant on June 16, through a letter from the sheriff. His wife attempted to contact Ficker but was successful only in speaking with Burfield, who promised that Ficker would call back but he never did. On June 18, Schulze surrendered himself and arranged, on his own, for a bail hearing that afternoon. Ficker was finally contacted. He appeared at 2:00 and explained that the judge was willing to accept a guilty plea, enter probation before judgment, and impose a $200 fine. Schulze accepted that arrangement and was released.

AGC charged Ficker with violations of MLRPC Rules 1.1, 1.3, 5.1, 5.3, and 8.4. Judge Ferretti regarded the alleged Rule 1.1 violation as based on the assertion that Ficker was not prepared for trial on January 28 because he had not sought out and interviewed other guests at the party as possible defense witnesses. The judge did not believe that AGC had established a duty on Ficker's part to seek out and interview such prospective witnesses, whose names were never supplied by the client, and, on that basis, found no violation of Rule 1.1. AGC has excepted to that ruling, pointing out that the problem was not simply the failure to seek out unidentified witnesses but rather a more fundamental failure to prepare for trial. Ficker, it contends, did very little to familiarize himself with the case, evidenced most dramatically by being unaware, even on the scheduled trial date, that Schulze had refused to take a breathalyzer test. In his closing argument, Bar Counsel made clear that the real basis for the complaint was that Ficker waited until the morning of trial to do any discovery or investigation.

We agree with AGC. Notwithstanding Ficker's self-serving statement that he was prepared for trial, the evidence demonstrated that he was wholly unprepared when he appeared in District Court on January 28. Apart from his not inquiring as to other guests at the party, prior to the morning of trial he had never talked to Schulze's wife, who was a vital witness to most of what occurred, to the arresting officer, or to the other two officers who were present at the police station. Indeed, except for an initial conversation two months earlier and the brief conversation the evening before, he had never had any significant discussion with his client. Although presumably aware from the written statement given to Burfield that Schulze had a CAT scan scheduled for the day after the incident, Ficker did nothing to investigate the nature of the problem or whether it might have had some relevance to Schulze's conduct. Indeed, given his apparent unawareness that Schulze had refused to take the breathalyzer test, it is not clear that Ficker even read that statement carefully.

This practice of waiting until the morning of trial to learn the facts of the case from last-minute courtroom interviews with police officers, prosecutors, or other witnesses, which Allen confirmed was more or less the *modus operandi* with Ficker, does not comport with the requirements of Rule 1.1. That rule requires a lawyer to provide "competent representation" to a client and defines "competent representation" as requiring, among other things, "thoroughness and preparation reasonably necessary for the representation." The Comment to Rule 1.1 explains, in that regard:

"Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake...."

The requirement of adequate preparation has long been recognized as part of a lawyer's responsibility to provide competent representation, and it is not without significance that, in the current Code of Professional Responsibility em-

bodied in the MLRPC, the duty to provide competent representation is given "the place of honor as the first ingredient in the lawyer-client relationship." 1 GEOFFREY C. HAZARD, JR. AND W. WILLIAM HODES, THE LAW OF LAWYERING, 2d ed. § 1.1:101 (1997). Former DR 6–101(A)(2) precluded a lawyer from handling a matter "without preparation adequate in the circumstances," and the failure to make a proper investigation of the facts of a case prior to trial has led to discipline. *See In Re Conduct of Chambers*, 292 Or. 670, 642 P.2d 286, 291 (1982); *People v. Felker*, 770 P.2d 402 (Colo.1989). *See also Lamar v. American Finance System of Fulton Cty., Inc.*, 577 F.2d 953, 955 (5th Cir.1978), noting the duty in a non-disciplinary context.

This was not a simple, routine case. The written statement provided by Schulze should have alerted Ficker that there would likely be a significant dispute as to exactly what occurred during the roadside encounter and later at the police station. If Schulze were convicted of driving while intoxicated, he faced the prospect of incarceration in either a detention facility or a DWI facility, a prospect made more likely if the judge were to conclude that it was Schulze, rather than the officer, who was abusive and uncooperative. The decision to seek a jury trial was not made until the morning of trial; indeed, it hinged, among other things, on Schulze's willingness to pay an additional fee of $599, which had not previously been discussed with Schulze. What would Ficker have done if Schulze had decided not to pay that additional money? Presumably, Ficker went to court with the expectation of having to try the case that morning, and yet, when he entered the courtroom, late, he had little idea of what any of the witnesses would say. Indeed, only moments before the case would have been called for trial, he told Schulze that, if trial were to take place then, "[w]e can go into the anteroom and rehearse all this and go over the facts of the case." That is *not* an acceptable way to practice law. *See People v. Felker, supra,* 770 P.2d 402 (preparing a case in the car on the way to court constitutes violation of former DR 6–101(A)(2)). We believe that Judge Ferretti erred in finding no violation of Rule 1.1.

AGC charged two independent violations of Rule 1.3. The first arose from the fact that, having prayed a jury trial on January 28, 1992, Ficker did nothing to keep track of the case in the circuit court and, as a result, was unaware (1) that his appearance had not been entered, and (2) of the scheduled conference and trial dates. The second alleged violation arose from Ficker's failure to return the calls from Schulze's wife on June 16 and 18. Judge Ferretti found merit in the first claim, but none in the second. Ficker has excepted to the adverse ruling with respect to not keeping track of the case; AGC has acquiesced in ruling regarding the telephone calls.

█ This Court has long recognized a duty on the part of counsel to keep informed about the status of a case in litigation. *See Baltimore Luggage Co. v. Ligon,* 208 Md. 406, 421–22, 118 A.2d 665, 673 (1955); *Grantham v. Prince George's County,* 251 Md. 28, 36, 246 A.2d 548, 552 (1968); *Maggin v. Stevens,* 266 Md. 14, 18, 291 A.2d 440, 442 (1972). Ficker admitted that he had no tickler or calendar system in place that would cause him to pull files at particular intervals to check whether court dates had been assigned, but instead relied on receiving notice from the court. He acknowledged that, normally, notices were sent within two to three months after the filing of a jury demand, although there were occasions when the notice did not arrive for four or five months. Ficker saw no need for greater diligence because this kind of mix-up by the clerk had never happened to him before and he did not anticipate it.

It is true, as Ficker maintains, that defense counsel has no duty to bring a criminal case to trial; that is the State's obligation. He does have a duty, however, to keep track of his cases and assure that he does not miss important court dates, especially a trial date. The need for periodic review is most acute, of course, with respect to filings or other events that the attorney is responsible for generating, but it extends as well to filings and events expected from someone else. If a pleading, paper, or notice of some kind is due to be filed or sent by another party or the court and that filing or transmis-

sion will engender some duty on the attorney's part, the attorney cannot sit blithely by in blissful ignorance, as though the case doesn't exist. There *are* slips between the cup and the lip; things *do* get lost in the mail or misdirected. Although a lawyer may, in some instances, properly wait in silence for others to act and be under no obligation *to them* to call attention to *their* lapses, the lawyer does have a duty to his or her client to remain diligent, and that duty is not discharged by placing the file in indefinite hibernation. Had Ficker had a decent tickler system, whether diaried for two months, three months, four months, or even five months, he would have discovered the problem. Under his practice, Ficker would never have looked at the Schulze file again, even if a year or more elapsed.

Although no hard and fast rule can be imposed governing the precise details of a proper tickler system, the need for some system is obvious. Ficker, by his own admission, had none. His exception to the finding of a violation of Rule 1.3 is overruled.

■ Judge Ferretti found no independent violation of Rule 1.4, and no violation of Rules 5.1 or 5.3. AGC has acquiesced in those rulings. The judge found that Ficker's failure to maintain a proper tickler system, discussed in the context of Rule 1.3, also constituted a violation of Rule 8.4. Ficker has excepted to that ruling, largely for the reasons we discussed above. In *Ficker I, supra,* 319 Md. 305, 315, 572 A.2d at 501, 506, we concluded a failure to appear caused by the lack of a proper calendar system can constitute conduct prejudicial to the administration of justice, and thus a violation of Rule 8.4. His exception is overruled.

### CONCLUSION

We have found the following violations by Ficker: in *Jordan,* violations of Rules 1.1 and 5.1; in *Klein,* a violation of Rule 5.1; in *Ruby,* a violation of Rules 1.3, 3.4, and 8.4(d); and in *Schulze,* a violation of Rules 1.1, 1.3, and 8.4(d). Unquestionably, the most serious violations were those emanating

from Ficker's practice of assigning and handling cases in such a manner that the lawyer ultimately charged with actually representing the client went into court unprepared or missed scheduled trial dates entirely. That was the situation in *Jordan, Klein,* and *Schulze.* Although some of those instances occurred before we filed our opinion in *Ficker I,* they all arose after Ficker became aware, as the result of two of the instances that led to *Ficker I,* that he needed to change his method of operation. What is apparent, not just from the facts of these particular incidents but also from the testimony by Ficker and his associates of how he conducted his practice generally, is that he was running a high-volume operation without adequate managerial safeguards and that, as a result, clients were not afforded competent representation.

Lest there be any possible misunderstanding, we make clear that, absent some compelling extenuating circumstance, it is ordinarily unacceptable for a lawyer to appear in court for a trial or other proceeding unprepared, and that doing so may constitute a violation of Rule 1.1. The degree of preparation required obviously depends on the nature, complexity, and seriousness of the case, but, in the absence of an extenuating circumstance, appearing for trial or other proceeding without having a reasonable understanding of the relevant facts and legal issues and without having made a reasonable effort to gather relevant evidence does not ordinarily constitute the kind of preparation required by the Rule. Managing a law office in such a manner that subordinate lawyers are put in that position does not comport with the requirements of Rule 5.1, as it subjects those subordinate lawyers to liability under Rules 1.1 and 5.2.

There is no specific rule requiring lawyers to keep a tickler or calendar system. Such a system, however, is necessary to assure compliance with other rules, especially Rules 1.1 and 1.3. When a lawyer has responsibilities under Rule 5.1 for other lawyers, such a system becomes even more important. Proper law office management is more than just a matter of good business. It has a clear and important bearing on professional responsibility as well. *See Ficker I, supra,* 319

Md. 305, 572 A.2d 501; *Attorney Griev. Comm'n v. Goldberg,* 292 Md. 650, 441 A.2d 338 (1982); *Sanchez v. State Bar,* 18 Cal.3d 280, 133 Cal.Rptr. 768, 555 P.2d 889 (1976); *State ex rel. Oklahoma Bar Ass'n v. Braswell,* 663 P.2d 1228 (Okla. 1983).

For the violations found in these cases, and in light of Ficker's previous reprimand, we believe that the appropriate sanction is an indefinite suspension from the practice of law, with the right to reapply for admission after 120 days from the effective date of suspension. The suspension shall commence 30 days from the filing of this Opinion. On or before the commencement of the suspension Ficker shall (1) provide to Bar Counsel a list of all clients by whom he is then retained and provide a copy of a letter to each such client indicating that he is suspended from the practice of law pursuant to Order of this Court and advising the clients of their right and need to seek alternative counsel, and (2) notify in writing all courts of record in which his appearance has been entered that the appearance is withdrawn or stricken due to his suspension.

As a condition to reapplication, Ficker shall:

(1) pay all costs assessed by this Court;

(2) demonstrate to the satisfaction of Bar Counsel that he has in place systems and procedures necessary to assure that (A) the number of cases accepted does not exceed the ability of the firm to handle them competently, (B) cases are assigned in a reasonable and timely manner to allow the attorney assigned to do adequate preparation and to be able to meet scheduled court appearances, (C) files are reviewed periodically and the responsible lawyer keeps abreast of the status of his or her cases, and (D) messages and other information regarding cases are promptly brought to the attention of the responsible lawyer and, when appropriate, placed in the case file; and

(3) inform Bar Counsel of the name and address of a monitor, acceptable to Bar Counsel, who will agree, at Ficker's expense, to oversee Ficker's practice of law for a period of at

least two years and to provide to Bar Counsel monthly reports for one year and quarterly reports for the second year.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715c, FOR WHICH JUDGMENT IS ENTERED IN FAVOR OF ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ROBIN K.A. FICKER; SUSPENSION SHALL COMMENCE 30 DAYS FROM THE FILING OF THIS OPINION.