*Attorney Grievance Commission of Maryland v. Robin Keith Annesley Ficker*
Misc. Docket AG No. 17, September Term, 2020.

**Attorney Discipline – Competence & Diligence – Candor Before Tribunal & Misrepresentation – Supervision of Non-Lawyer Assistant – Disbarment**. Disbarment is the appropriate sanction where an attorney with a lengthy disciplinary history of similar ethical violations failed to appear for the scheduled trial of a client, and made false statements to that court concerning whether he had reviewed and signed a continuance motion that had been prepared, signed, and filed by his office manager and that contained a materially false statement concerning the position of the opposing party.

Maryland Attorneys' Rules of Professional Conduct 19-301.1, 19-301.3, 19-303.3(a), 19-305.3(a)-(b), 19-308.4(a), (c)&(d).

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 17

September Term, 2020

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

ROBIN KEITH ANNESLEY FICKER

_____

Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Opinion by McDonald, J.

_____

Filed: March 3, 2022

*McDonald, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled Pursuant to MD Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Respondent Robin K.A. Ficker has been disciplined for professional misconduct on eight occasions, both in this Court and the United States District Court for the District of Maryland. Beginning in 1990, when the Attorney Grievance Commission filed the first set of charges against Mr. Ficker, those occasions arose, variously, from his failures to appear in court on dates scheduled for his clients' trials, failures to adequately prepare for his clients' cases, failures to supervise the lawyers whom he employed to work on his clients' cases, lack of candor to the court, and, in one instance, failure to safeguard client property. Four disciplinary proceedings resulted in published opinions. In all, three generations of Bar Counsel have brought charges and 27 members of this Court have deliberated whether a particular sanction for Mr. Ficker's repeated infractions would deter further such practices and thus protect those who seek out his services. The Court's prior deliberations resulted in private reprimands, public reprimands, and indefinite suspensions of Mr. Ficker from the practice of law.

Here, once again, the Commission has charged Mr. Ficker with a slate of violations of the Maryland Attorneys' Rules of Professional Conduct ("MARPC"). In this case, the charges all stem from a situation in which Mr. Ficker failed to appear for a trial in the District Court sitting in Prince George's County; assured the trial judge that his office had contacted his absent client about the trial date without a basis to believe that assurance to be true; and made contradictory statements as to whether he had personally signed a continuance motion that contained misstatements and that in fact had been signed and filed by his office assistant (a disbarred former attorney).

While a missed court date by an over-scheduled attorney who relies on office staff to meet the demands of a busy schedule or a good faith fumble in the filing of a continuance motion would not typically result in disbarment, the circumstances of Mr. Ficker's cases are far from typical. Mr. Ficker has consistently failed to comply with elementary standards of the legal profession that are intended for the protection of clients and for the efficient administration of justice in our courts. The sanctions that the Court has imposed on Mr. Ficker in the past have apparently not had the desired effect. The process must come to an end. Mr. Ficker has forfeited the privilege of practicing law in Maryland and will be disbarred.

## I

## Mr. Ficker's Disciplinary History

Mr. Ficker has been a member of the Maryland Bar since June 1973. His lengthy disciplinary history since his admission may be unique in the annals of the bar. This Court has previously observed that his misconduct regarding a single client "cannot be viewed in a vacuum."[1] So, too, the violations currently at issue must be considered in the context of Mr. Ficker's persistent failure to operate his law practice in compliance with the rules of professional conduct. It has been said that "what's past is prologue."[2] We begin with a review of Mr. Ficker's past misconduct.

---

[1] *Attorney Grievance Comm'n v. Ficker*, 349 Md. 13, 32 (1998).

[2] William Shakespeare, The Tempest, Act II, sc. 1.

This is Mr. Ficker's fifth appearance before this Court as a respondent in an attorney disciplinary proceeding. *See Attorney Grievance Comm'n v. Ficker*, 319 Md. 305 (1990) (*Ficker I*); *Attorney Grievance Comm'n v. Ficker*, 349 Md. 13 (1998) (*Ficker II*); *Attorney Grievance Comm'n v. Ficker*, 399 Md. 445 (2007) (*Ficker III*); *Attorney Grievance Comm'n v. Ficker*, 454 Md. 76 (2017) (*Ficker IV*). In addition to those proceedings, Mr. Ficker has twice been the subject of private reprimands by the Commission, as well as reciprocal disciplinary proceedings in the federal district court.[3]

## Ficker I

In *Ficker I*, this Court determined that Mr. Ficker violated the rules of professional conduct in his representation of two clients during the 1980s. In one case, a woman had been charged with driving while intoxicated. 319 Md. at 308-09. Mr. Ficker agreed to represent her at her trial in the District Court. However, he did not enter his appearance in the case, as required by the Maryland Rules, and did not appear for the trial, apparently because he failed to record the trial date on his calendar. Unrepresented, the client pled guilty to the charge.

---

[3] As recounted in this opinion, Mr. Ficker may have the unique distinction of having violated three iterations of the rules of professional conduct. At the time he was admitted to the Maryland Bar, the ethical rules were contained in the Code of Professional Responsibility. Maryland Rules, Appendix F (1971). In 1987, this Court adopted the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"). Maryland Rule 1230, Appendix (1987). The MLRPC were amended from time to time over the years. Effective July 1, 2016, the MLRPC were renamed the MARPC and recodified without substantive change in Title 19, Chapter 300 of the Maryland Rules. The rules have retained their previous numbering in a modified format, *e.g.*, former MLRPC Rule 1.1 is now MARPC Rule 19-301.1. For ease of reference and as permitted by the rules, we use the shorter designations of the MLRPC in this opinion. *See* Maryland Rule 19-300.1(22).

The second case also involved a client charged with drunk driving and facing trial in the District Court sitting. 309 Md. at 309-11. Mr. Ficker went to court on the initial trial date but did not enter his appearance, again contrary to the Maryland Rules. The trial was continued at the State's request because the arresting officer was not on hand, but Mr. Ficker did not receive notice of the new trial date because he had not entered his appearance. When the case came up again for trial, his unrepresented client was able to explain the situation to the court, and the trial was continued again. This time, Mr. Ficker received actual notice of the new trial date from the client's mother. He had another matter scheduled for that date in a different court, and he prepared a motion for another continuance of the trial, but his continuance motion never reached the District Court because he had put the wrong zip code on the envelope. Mr. Ficker simply assumed that the continuance motion would be granted and did not appear for the client's trial. Although the District Court judge offered to grant the client yet another continuance, the client elected to proceed *pro se* and pled guilty to the charge.[4]

In the ensuing disciplinary proceeding, this Court concluded that Mr. Ficker had violated rules of professional conduct regarding neglect of matters entrusted to an attorney, conduct prejudicial to the administration of justice, and lack of diligence. The Court also found that Mr. Ficker had habitually violated a court rule requiring an attorney to enter an

---

[4] Mr. Ficker represented the client without charge in a *de novo* trial of the charges in the circuit court. The client was convicted again and ordered to pay a fine nearly double that imposed in the District Court. 319 Md. at 311.

appearance in a case – which was itself another violation of the applicable ethical rules.[5]

In considering the appropriate sanction for these violations, the Court noted that the hearing judge in the disciplinary proceeding had opined that Mr. Ficker now understood "that he cannot again take the filing or approval of his motions for granted" and found that Mr. Ficker had "learned his lesson" with respect to his ethical lapses. The Court issued a public reprimand.[6] 319 Md. at 323.

## *Ficker II*

Before long, the Commission had received eight complaints regarding Mr. Ficker's conduct between 1988 and 1992 and once again initiated disciplinary proceedings. During the pertinent time, Mr. Ficker was operating three law offices (in Bethesda, College Park, and Frederick) and handled an estimated 750-850 cases per year, primarily serious traffic violations. 349 Md. at 17. He employed an ever-changing cast of two or three associates and one non-lawyer office assistant. One of his former associates testified that Mr. Ficker would routinely assign a case the day before trial to an associate who had neither seen the case file nor met the client. Because the case file often did not include the police report, the associate would only learn the facts of a case through discussions with the prosecutor or the police officer on the morning of trial. *Id.* at 18.

---

[5] At the time of these violations, the ethical rules were governed by the Code of Professional Responsibility.

[6] One judge would have imposed a 30-day suspension.

The Court ultimately determined that Mr. Ficker had violated various provisions of the MLRPC with respect to four clients. One client faced charges including driving while intoxicated in Washington County. 349 Md. at 25-29. Mr. Ficker requested a jury trial on behalf of that client, but failed to show up for the trial in the circuit court. The court found him in contempt and fined him $1,000.[7] As it turned out, Mr. Ficker had assigned that case to a new associate who had started that same week and had never tried a case before a jury (a fact of which Mr. Ficker claimed to be unaware). The associate received the case file the day before the scheduled trial and was under the impression that his assignment was to go to the District Court and request a jury trial. The associate never entered his appearance in the case, and the client was expecting Mr. Ficker to appear on his behalf. Concluding that "[t]he deficiency here was in failing to supervise the associates ... exacerbated by the manner in which cases were assigned to them," the Court found Mr. Ficker in violation of Rules 1.1 and 5.1 for failure to ensure that a subordinate lawyer could provide competent representation to the client. *Id*. at 28-29.

Mr. Ficker was found to have committed similar violations as to a second client who had also been charged with an alcohol-related driving offense. 349 Md. at 29-32. This would be a second offense for this client, and a jury trial was requested. While Mr. Ficker and two of his associates had entered their appearances in the case, neither Mr. Ficker nor any of his associates was present when the case was called for trial. Mr. Ficker was

_____

[7] The court struck the contempt finding upon a motion for reconsideration, and Mr. Ficker donated the amount of the fine to the Washington County Library. 349 Md. at 26 n.2.

6

occupied in another court at the time, and a third associate, who had no familiarity with the case and who had been scheduled to be in another court, was sent to represent the client.[8]

This Court concluded that Mr. Ficker had violated Rule 5.1 (responsibilities of supervising attorneys), noting that the case "cannot be viewed in a vacuum" and that the confusion as to the client's representation was caused by Mr. Ficker "assigning too many cases to too few lawyers, mostly at the last minute." 349 Md. at 32. The Court observed that Mr. Ficker "essentially operated his practice like a taxicab company, with [his office manager] as the dispatcher." *Id.* It characterized those practices as "unacceptable," observing that Mr. Ficker's client was faced with the "prospect of either falling on his sword or going to trial with a lawyer he never hired and who knew little or nothing about his case." *Id.*

Three additional violations stemmed from Mr. Ficker's representation of a third client in the District Court sitting in Montgomery County. That client, with Mr. Ficker's advice, pled guilty to driving while intoxicated. 349 Md. at 33-35. The client's sentencing was postponed for approximately two months so that he could be evaluated for a special treatment program for repeat offenders. Under the process then in place – of which Mr. Ficker was aware – a defendant's attorney was required to initiate the evaluation, after which there would be an interval of several weeks for a screening report to be produced for sentencing. Mr. Ficker made one unsuccessful attempt to initiate the evaluation

---

[8] The client ultimately chose to proceed with that attorney, pled guilty pursuant to a plea agreement, and received a jail sentence suspended in favor of probation and a fine. 349 Md. at 29.

7

immediately after his client's guilty plea.  However, his office did not try again until days before the sentencing, and the delay resulted in a postponement of the sentencing.  The Court found that Mr. Ficker's lack of diligence violated Rule 1.3 (diligence) and "constituted a knowing disobedience of the judge's instruction to have his client evaluated in time for sentencing" in violation of Rule 3.4(c).  349 Md. at 35.  As a result of these violations, Mr. Ficker also violated Rule 8.4(d) (conduct prejudicial to the administration of justice).[9]

Finally, the Court concluded that Mr. Ficker violated the rules of professional conduct in his representation of a fourth client.  349 Md. at 35-42.  That client, who had been charged with driving while intoxicated and several related offenses that were scheduled for two separate trials, responded to a targeted solicitation from Mr. Ficker and scheduled a meeting with him at Mr. Ficker's office.  Mr. Ficker failed to show up for the meeting.  The client provided Mr. Ficker's office assistant with the two court notices and his own detailed statement of facts.  The assistant assured the client that Mr. Ficker would move to consolidate the cases.  Mr. Ficker entered his appearance but did not file a motion to consolidate.  When the first case involving the lesser charges was called for trial, no one from Mr. Ficker's office appeared in court.  The client ended up paying the fine specified in the tickets.  This Court noted that the explanation Mr. Ficker provided in the disciplinary

---

[9] Ultimately, the client missed the belated appointment, later showed up in court under the influence of alcohol, and was sentenced to 179 days incarceration without ever being evaluated for the treatment program.

8

proceeding for his failure to appear was inconsistent with his testimony in a collateral case regarding a payment dispute. *Id*. at 37 n.4.

Mr. Ficker *did* appear for the trial of the second set of charges against the client, but was "wholly unprepared." 349 Md. at 39. He had never had any significant discussion with the client and had never spoken at all with the client's wife (who had been present at the time of the alleged offense) or with any of the officers involved in the case. Mr. Ficker told the client that his best option was to request a jury trial in circuit court. The client agreed to this approach and paid Mr. Ficker an additional fee. This Court questioned whether Mr. Ficker had even read the detailed statement of facts that the client had left with his office assistant. It noted that Mr. Ficker's "modus operandi" was to "wait until the morning of trial to learn the facts of the case from last-minute courtroom interviews with police officers, prosecutors, and other witnesses" – a practice the Court found to be at odds with an attorney's obligation to provide competent representation. *Id*. In the end, Mr. Ficker never received the notice of the new trial date, which was sent to the wrong address. As a result, neither he nor his client appeared for trial, and a bench warrant was issued for the client. The client ultimately pled guilty and received probation before judgment and a $200 fine.

This Court concluded that Mr. Ficker violated three provisions of the rules of professional conduct in his representation of this client: (1) his failure to adequately prepare for trial violated Rule 1.1 (competence); (2) his lack of a system for checking on the status of cases, instead relying entirely on court notices, violated Rule 1.3 (diligence); and (3) his failure to appear as a result of his inadequate calendaring system violated Rule

9

8.4(d) (conduct prejudicial to the administration of justice).   349 Md. at 39-42.   In concluding that Mr. Ficker had failed to adequately keep track of his cases, the Court observed that an "attorney cannot sit blithely by in blissful ignorance, as though the case doesn't exist.  There *are* slips between the cup and the lip; things *do* get lost in the mail or misdirected … the lawyer does have a duty to his or her client to remain diligent, and that duty is not discharged by placing the file in indefinite hibernation."  *Id*. at 42 (emphasis in original).

In the aggregate, the Court found that Mr. Ficker had committed nine violations of the MLRPC with respect to these four clients.  The Court concluded that Mr. Ficker "was running a high-volume operation without adequate managerial safeguards" and that, "as a result, clients were not afforded competent representation."  349 Md. at 43.  Most of the violations occurred after he had been sanctioned – and all occurred after he had been charged – in *Ficker I*.  It appeared that Mr. Ficker had not in fact "learned his lesson" from the earlier disciplinary proceeding.  As a sanction, the Court suspended Mr. Ficker from the practice of law indefinitely but allowed him to apply for reinstatement after 120 days.  As a condition to reinstatement, the Court required, among other things, that Mr. Ficker put in place "systems and procedures" to ensure that the number of cases did not exceed the capacity of his firm, that cases were assigned within the firm in a reasonable and timely manner, that files were reviewed periodically so that the responsible lawyer could stay abreast of their status, and that messages and information regarding cases were promptly brought to the attention of the responsible lawyer.  *Id.* at 44.  Mr. Ficker's law license was reinstated in August 1998.

*1998 Private Reprimand*

Subsequent to *Ficker II*, in August 1998, the Commission issued a private reprimand to Mr. Ficker – an alternative to a disciplinary proceeding in this Court that is no longer available under the rules – for a violation of Rule 1.1 (competence). *See Attorney Grievance Comm'n v. Ficker*, 399 Md. at 447 n.1.

*2002 Private Reprimand*

In January 2002, the Commission issued another private reprimand to Mr. Ficker for a violation of Rule 1.4 (communication with client). *See Attorney Grievance Comm'n v. Ficker*, 399 Md. at 447 n.1.

*Ficker III*

After Mr. Ficker had been reinstated to the Maryland Bar, this Court found in *Ficker III* that Mr. Ficker had committed eight violations of the ethical rules with respect to three different clients. Mr. Ficker was retained to represent the first client in separate trials of charges of driving under the influence and related offenses in Anne Arundel County. 399 Md. at 448-51. Mr. Ficker entered his appearance and filed a motion to consolidate trial of the charges, but then failed to advise the client whether the motion had been granted and had no further involvement in the client's case. At the time, there was no formal system for assigning cases within Mr. Ficker's office. One of Mr. Ficker's associates contacted the client the day before the trial. Although the State's Attorney's office had already informed Mr. Ficker's office in writing that the client had two prior convictions, the associate did not learn about the second conviction – on the basis of which the State offered a plea that would likely result in jail time for the client – until the day of trial. The associate

11

had not previously discussed the possibility of jail time with the client. The client ultimately accepted the plea deal and served 10 days in jail. The Court concluded that Mr. Ficker had violated Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication with client), and 5.1 (responsibilities of supervising attorney). *Id*. at 450.

The second client had been charged with stalking, telephone misuse, and harassment. 399 Md. at 451-52. Mr. Ficker did not enter his appearance in her case until nearly three months after she had retained him. As a result, he was not aware that her trial had been postponed or that the court, believing that the defendant was unrepresented, had scheduled a proceeding for the original trial date to inform her of her right to counsel. The client appeared in court that day, but Mr. Ficker did not. Mr. Ficker told the client that there had been a "misunderstanding" and "her case had not been entered on the firm's trial calendar." *Id*. at 451. The trial judge granted the client a further postponement but complained to Bar Counsel about Mr. Ficker's conduct. This Court concluded Mr. Ficker had violated Rules 1.3 (diligence) and 8.4(d) (conduct prejudicial to the administration of justice). *Id*. at 452.

The third client contacted Mr. Ficker approximately a week before his scheduled trial on a charge of driving under the influence of alcohol. 399 Md. at 452-54. Mr. Ficker collected a fee from the client and deposited it into his operating account. He immediately entered his appearance in the case, even though there was no way he or any other attorney in his office would have been able to attend the trial. After his request for a continuance was denied, Mr. Ficker asked a former associate to appear for him and ask for reconsideration of the continuance motion. That motion was denied, and a warrant was

12

issued for the client, who also had not appeared in court. This Court concluded that Mr. Ficker had violated Rules 8.4(d) (conduct prejudicial to the administration of justice) and 1.15(a) (safeguarding client property). *Id*. at 454-55.

In devising its sanction in *Ficker III*, the Court stated that Mr. Ficker's conduct had demonstrated "an inexcusable lack of concern … for the welfare of his clients" and "an unwillingness, after four warnings, to make the necessary improvements to his office management." 399 Md. at 455. The Court indefinitely suspended Mr. Ficker from the practice of law once again, this time allowing him to apply for readmission after one year. The Court indicated that, if Mr. Ficker were to seek reinstatement, he should "be prepared to demonstrate that he will have in place specific and reliable systems and procedures necessary to ensure that the problems that have plagued his practice for the past seventeen years do not recur." *Id*. at 455-56. Dissenting from the sanction, one member of the Court opined that "[i]f disbarment is not warranted in this case for these types of issues, with a respondent with this history, it will never be warranted." *Id.* at 456 (Cathell, J., concurring and dissenting).

A year and a half later, Mr. Ficker appeared in this Court in connection with his petition for reinstatement from that suspension. He was subject to extensive questioning by members of the Court about the reform of his office procedures, and professed to be committed to improving the management of his law office.[10] The then-Bar Counsel

---

[10] Petition for the Reinstatement to the Practice of Law of Robin K.A. Ficker, Misc. AG No. 83 (Sept. 2007 Term) (December 4, 2008) (webcast available at https://mdcourts.gov/coappeals/webcasts/webcastarchive2008term).

13

consented to the petition, but noted that Mr. Ficker had a "sword … hanging over his head" and would likely lose his law license if he found himself before the Court in another disciplinary proceeding. On December 8, 2008, Mr. Ficker was reinstated. *In re Reinstatement to Practice of Law of Ficker*, 406 Md. 577 (2008).

*Ficker IV*

Mr. Ficker was again the subject of disciplinary action in 2017 in *Ficker IV*. 454 Md. at 76-77. That case arose when Mr. Ficker entered his appearance in 2015 in the District Court in Howard County on behalf of a client charged with theft. The trial was scheduled for 9 a.m. on the same date that Mr. Ficker had another matter scheduled for 8 a.m. in the District Court in Montgomery County. Mr. Ficker did not appear for the trial in Howard County, and arrived at that court only after the trial judge placed two calls to Mr. Ficker's office. Mr. Ficker maintained that he had instructed his office assistant, Jason Kobin, a former associate who had been disbarred,[11] to notify the District Court in Howard County that he would be delayed. However, that court had no record that it had received that information. In the resulting disciplinary matter, Mr. Ficker admitted to the underlying facts in a Joint Petition for Reprimand by Consent filed by Bar Counsel. That petition, which was granted by this Court, recognized that he had violated Rule 8.4(d) by failing to appear punctually in the District Court in Howard County and Rule 5.3(d) by failing to follow that rule's procedures for employing a disbarred former lawyer as a nonlawyer.

---

[11] *See Attorney Grievance Comm'n v. Kobin*, 431 Md. 392 (2013) (per curiam disbarment order), 432 Md. 565 (2013) (opinion explaining reasons for disbarment). As we shall see, Mr. Kobin plays a role in the current case as well.

14

*Reciprocal Discipline and Application for Readmission*
*in the United States District Court for the District of Maryland*

As a result of Mr. Ficker's suspension from the Maryland Bar in *Ficker II*, Mr. Ficker had also been suspended from the Bar of the United States District Court for the District of Maryland since 1998. In 2017, while *Ficker IV* was pending in this Court, Mr. Ficker applied *pro se* to the federal district court for reinstatement to that bar. In a written report on his petition, a three-judge panel emphasized Mr. Ficker's "cavalier approach" and lack of candor:

> Of particular note, Ficker misrepresented in his reinstatement petition that he had not been charged with a crime or previously found in contempt. Aside from the falsity of these representations, it demonstrates to the Panel that Ficker appreciates the relevance of such issues in reaching whether he is fit for reinstatement. Undeniably however, Ficker has been charged with crimes on more than one occasion, convicted at least once, and held in contempt twice, but offers little explanation for why he nonetheless meets the moral qualifications for reinstatement to practice in this Court.
>
> Equally troubling is Ficker's sworn testimony before the Panel. Ficker admitted that he was untruthful in his reinstatement petition, and was so without regard for the responsibility of an attorney to research adequately the matters put before the Court and his duty of candor to the tribunal. Ficker's cavalier approach to his testimony, his searching for explanations on the stand, and his oddly jocular demeanor, convince this Panel that Ficker treated his reinstatement petition with the same lack of diligence that has plagued his representation of clients for decades.

*In re Ficker*, 2018 WL 9600450 at *5-6 (D. Md. Aug. 29, 2018). The Chief Judge of the federal district court ultimately adopted the panel's recommendation to deny the reinstatement petition and also imposed an additional indefinite suspension from the

practice of law before the federal district court as reciprocal discipline relating to *Ficker IV*. *In re Ficker*, 2018 WL 9597499 at\*1 (D. Md. Sept. 7, 2018).

## II

## The Most Recent Alleged Violations by Mr. Ficker

### A.    *Procedural Context*

On June 24, 2020, the Commission, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action alleging that Mr. Ficker violated the following rules of professional conduct:   Rule 1.1 (competence), Rule 1.3 (diligence), Rule 3.3 (candor toward the tribunal), Rule 5.3 (responsibilities regarding non-attorney assistants), and Rule 8.4(a), (c), and (d) (misconduct).   The alleged violations all relate to Mr. Ficker's representation of Stephon Sauls in the District Court of Maryland sitting in Prince George's County.

In accordance with Maryland Rule 19-722(a), this Court designated Senior Judge Dwight D. Jackson to conduct an evidentiary hearing and to provide findings of fact and conclusions of law regarding the alleged violations.   The hearing judge held a hearing via Zoom on May 20, 2021 and issued a memorandum opinion.   The hearing judge found clear and convincing evidence that Mr. Ficker had committed all of the alleged violations.   The hearing judge also identified five aggravating factors and one mitigating factor related to the sanction to be imposed.   Mr. Ficker filed exceptions to several of the hearing judge's findings of fact and each of his conclusions of law.   Bar Counsel did not file any exceptions. We held oral argument on December 2, 2021 to consider Mr. Ficker's exceptions and the appropriate sanction.

16

***B.***    ***Facts***

We accept the hearing judge's findings of fact unless clearly erroneous. Maryland Rule 19-740(b)(2)(B). The stipulated facts, the hearing judge's findings of fact, and other undisputed matters in the record provide the basis for the facts which follow. Mr. Ficker's exceptions to the findings of fact are considered with the findings to which they relate.

1.    Mr. Ficker's Current Law Practice

Mr. Ficker currently works as a solo practitioner out of a law office in College Park. He handles serious traffic cases and some low-level criminal cases, the vast majority of which are in the District Court. He has employed Mr. Kobin as his office manager since Mr. Kobin's disbarment in 2013. Mr. Ficker and Mr. Kobin work alongside each other in the same room. Both men testified at Mr. Ficker's hearing that they "constantly" discuss matters, that they seek to resolve Mr. Ficker's scheduling conflicts, and that they keep track of his schedule with a Microsoft Excel spreadsheet. As a matter of practice in place before February 2019, Mr. Ficker had authorized Mr. Kobin to prepare, sign, and file motions for continuances on his behalf. Mr. Kobin was expected to seek the consent of the Assistant State's Attorney handling the particular case prior to filing such a motion.

2.    Representation of Stephon Sauls

On October 15, 2018, Stephon Sauls hired Mr. Ficker to represent him in three separate traffic cases in the District Court sitting in Prince George's County. Mr. Sauls agreed to pay Mr. Ficker a flat fee of $399 per case. This disciplinary proceeding arises from the second of those cases, in which Mr. Sauls was charged with driving or attempting to drive a motor vehicle on a highway without a required license or authorization.

*Scheduling of the February 7 Trial*

Mr. Sauls had previously failed to appear for a court date in this case in November 2017, and the District Court had issued a bench warrant for him as a result. Although Mr. Sauls had not yet paid Mr. Ficker for this case,[12] Mr. Ficker entered his appearance as counsel for Mr. Sauls on November 2, 2018. On November 30, 2018, the court granted Mr. Ficker's motion to quash the bench warrant, and it reset the case for trial on February 7, 2019 at 8:45 a.m. in the District Court location in Hyattsville.

*Scheduling Conflict and Delegation of Continuance Motion*

At least two weeks prior to the February 7 trial date, Mr. Ficker became aware that he had other cases scheduled that morning in both Washington County and Montgomery County. Mr. Ficker instructed Mr. Kobin to prepare continuance motions for the cases in Montgomery County and Prince George's County and to seek consent from the prosecutors handling the respective cases.

On February 6, 2019, Mr. Kobin prepared and signed Mr. Ficker's name to a one-page "Line of Appearance and Consent Motion for Continuance" (the "continuance motion") in the Sauls case and filed it with the District Court in Prince George's County. Mr. Ficker had neither reviewed the motion nor signed it. Mr. Kobin had signed the filing without indicating in any way that he had signed it on Mr. Ficker's behalf. The filing indicated that the "Duty State's Attorney, Mr. Palisano" had consented to the requested

---

[12] Mr. Sauls had paid the fee for the first case in which Mr. Ficker had represented him in the District Court in Prince George's County. That traffic case was placed on the stet docket in October 2018.

18

continuance. While an attorney named Michael Palisano had once worked in the State's Attorney's Office, he had left the office in June 2018 and was not involved with the Sauls case. Mr. Kobin had filed the continuance motion using an old template without actually contacting anyone in the State's Attorney's Office.

It appears that Mr. Ficker never followed up with Mr. Kobin regarding whether the continuance motions related to the two February 7 trials, including the Sauls case, had been filed and granted.[13] In any event, Mr. Ficker assumed that they had been granted and attended the matter set in the District Court in Washington County on the morning of February 7.

*Attempt to Contact Mr. Sauls*

Neither Mr. Ficker nor Mr. Kobin spoke with Mr. Sauls about the attempt to continue the February 7 trial date. At the disciplinary hearing, Mr. Ficker introduced as an exhibit a letter addressed to Mr. Sauls dated January 25, 2019 that read, in full: "PLEASE CONTACT OUR OFFICE ASAP @ 301) 982-1501)." Mr. Kobin explained

---

[13] Mr. Ficker excepts to the hearing judge's finding on this score, although he concedes that it is "factually correct." He contends that the hearing judge should have credited him with a "good faith belief" that the motion in the Sauls case had been filed and granted. Before the hearing judge in this case, both Mr. Kobin and Mr. Ficker took the position that no news was good news. Mr. Kobin testified that he was "certain" that Mr. Ficker had followed up with him about the continuance motion in the Sauls case, "but I cannot recall him actually doing it." Mr. Ficker conceded that Mr. Kobin never affirmatively told him that the Sauls trial had been continued, but that he "knew that [Mr. Kobin] would let me know if there was a problem because that was an impossible split, Hagerstown and Hyattsville."

We overrule this exception. In light of Mr. Ficker's track record and his shifting explanations concerning the continuance motion, his "good faith belief" was at best willful blindness.

19

that the letter was prepared at Mr. Ficker's instruction after they were unable to reach Mr. Sauls. On cross-examination, Mr. Kobin was asked whether Mr. Ficker had asked him to contact Mr. Sauls prior to filing the continuance motion. Mr. Kobin replied: "I don't recall if I was specifically asked. I knew it was something that absolutely needed to be done. I knew Mr. Ficker made attempts to do that. I recall making attempts. I don't remember how many. And I remember it was decided, since those attempts were not working, we needed to draft a letter." Mr. Kobin confirmed that he did not speak to Mr. Sauls prior to filing the motion.

During his own testimony at his disciplinary hearing, Mr. Ficker also said that he tried to contact Mr. Sauls, but was unsuccessful. He explained that he knew about the February 7 court date when he sent Mr. Sauls the letter on January 25, but omitted that information because he wanted Mr. Sauls to call him so they could speak about the status of Mr. Sauls' driver's license.

*Failure to Appear for February 7 Trial*

When the Sauls case was called in the District Court in Prince George's County, neither Mr. Sauls nor Mr. Ficker was present. The Assistant State's Attorney handling the case, Olumide Olaloye, informed Judge Thurman Rhodes, who was to preside at trial, that he was unaware of the continuance motion that had been filed the previous day. Judge Rhodes had his courtroom clerk contact Mr. Ficker to inform him that his presence was required and held the case pending Mr. Ficker's arrival.

Mr. Ficker arrived at the District Court in Hyattsville just before noon and found the court in recess. He was able to locate Mr. Olaloye, who informed him that Mr. Palisano's

20

name had been erroneously included in the Sauls continuance motion. Mr. Ficker then called Mr. Kobin, who explained that he had used an outdated template to create the motion. During the call, Mr. Ficker learned that Mr. Kobin was in the hospital.

*Mr. Ficker's False Statements to the District Court*

When the Sauls case was called that afternoon, Judge Rhodes questioned Mr. Ficker about the continuance motion. Judge Rhodes began by exploring the provenance of the continuance motion:

> JUDGE RHODES: [] Mr. Ficker, we received your written motion by consent to continue this matter this morning. Is that right?
>
> MR. FICKER: I believe – that's what my office manager told me, Judge. He is now in the hospital.
>
> JUDGE RHODES: But this motion is signed by you, Mr. Ficker.
>
> MR. FICKER: Yes, it is.
>
> JUDGE RHODES: You're counsel of record in this case?
>
> MR. FICKER: No question about it.
>
> JUDGE RHODES: Correct?
>
> MR. FICKER: Absolutely.

Judge Rhodes pressed Mr. Ficker on whether he had signed the continuance motion. Mr. Ficker asked to see the motion and initially maintained that he had in fact signed it. When confronted with the fact that the purported consent had allegedly been given by someone who had not worked in the State's Attorney's Office for more than six months, Mr. Ficker initially suggested that Mr. Palisano's name had not been in the one-page document when he signed it. The exchange with Judge Rhodes was as follows:

21

JUDGE RHODES: You signed – you signed this motion though, Mr. Ficker, instead, that's what – is this your signature?

MR. FICKER: My name is on it, but my officer manager who's been my office manager for 10 years –

JUDGE RHODES:  Mr. Ficker?

MR. FICKER: Yes.

JUDGE RHODES:  Are you representing to this Court that you did not sign this motion, you had – you authorized someone who is not a member of the bar to sign this motion?

MR. FICKER: I'm saying I signed it, but I didn't know that – I didn't talk to Mr. Palisano, I didn't know that Mr. Palisano's name was in it, and –

JUDGE RHODES: How could you not know if you're signing it?

MR. FICKER: Mr. Palisano's name was not in it when I signed it.

JUDGE RHODES: When you signed it?

MR. FICKER: That's right.

JUDGE RHODES: So, you're saying this document was altered after you signed it, Mr. Ficker?

MR. FICKER: No, I'm not saying that.  I'm just saying I did not sign anything that had Mr. Palisano's name in it.

JUDGE RHODES: So, are you saying that this is not your signature on the motion?

MR. FICKER: May I see it again?

After reviewing the continuance motion a second time, Mr. Ficker finally admitted to Judge Rhodes that Mr. Kobin had signed Mr. Ficker's name to the document with his permission.  He then recounted that Mr. Kobin had told him earlier that day that Mr. Kobin

22

forgot to change the name in the office template. Mr. Ficker asserted that Mr. Kobin had told him that "he talked to someone else ... He can't – he doesn't, couldn't give me a name and he said it was a mistake to put Mr. Palisano in there." Mr. Ficker said he only found out about the issue when he spoke to the Assistant State's Attorney earlier that afternoon before the proceeding.

The discussion eventually shifted to the substance of the continuance motion, which was opposed by the State. Judge Rhodes asked Mr. Ficker when he had last spoken with Mr. Sauls; Mr. Ficker replied that he couldn't remember. Judge Rhodes then asked Mr. Ficker if he had told Mr. Sauls that he was going to file the motion to postpone the trial. Mr. Ficker assured him that he had:

> MR. FICKER: We always do that, Judge.
>
> JUDGE RHODES: We, but did you?
>
> MR. FICKER: I don't remember actually speaking to the client and telling him we were going to file a motion to postpone, but I'm 100% confident that someone in our office did.
>
> JUDGE RHODES: But not you?
>
> MR. FICKER: Either me or my office manager, it would be one of the two. But it wasn't me.

Remarking that it was unclear whether Mr. Sauls had been informed that he needed to come to court that morning, Judge Rhodes granted the continuance. He told Mr. Ficker that he was "terribly concerned about this motion" and would refer the matter to Bar Counsel.

Mr. Ficker's statements to Judge Rhodes that he had signed the motion were false. In this disciplinary proceeding, the hearing judge found by clear and convincing evidence

23

that Mr. Ficker "knowingly and intentionally lied when he initially misrepresented to Judge Rhodes that he personally signed the consent motion."[14] The hearing judge found that the purpose of Mr. Ficker's misrepresentation was to "conceal from Judge Rhodes that he had delegated to his non-attorney office manager the authority to sign a paper requiring his signature as the attorney for Sauls."

The hearing judge also concluded that Mr. Ficker knew that he personally had not spoken to Mr. Sauls and had no idea whether Mr. Kobin had. His assurance to Judge

---

[14] Mr. Ficker excepts to this finding and argues that any misrepresentation was the result of confusion. He argues that he did not knowingly lie to Judge Rhodes regarding his signature on the continuance motion and asserts that he freely admitted that Mr. Kobin had signed his name when later asked directly by Judge Rhodes whether he had signed it. However, Mr. Ficker had previously authorized Mr. Kobin to sign motions on his behalf. Thus, even if he had gone before Judge Rhodes with absolutely no context about the Sauls case, he would have known that it was possible that he had not signed the motion. Rather than admitting that possibility to Judge Rhodes he unambiguously asserted four separate times, as recounted in the text, that he himself had signed the motion. As the hearing judge concluded, it was "only after additional questioning made it impossible to maintain the lie" that Mr. Ficker admitted that Mr. Kobin had signed Mr. Ficker's name to the motion.

By the time he acknowledged to Judge Rhodes that Mr. Kobin had signed the continuance motion, Mr. Ficker had already reviewed the one-page document twice. His explanation that he was so "fixated on the Palisano thing" that he could not process who had signed the motion is not persuasive. Mr. Ficker stated, both before Judge Rhodes and in his testimony at the disciplinary hearing, that he had called Mr. Kobin prior to appearing before Judge Rhodes. During that call, Mr. Kobin had explained to him the origin of the continuance motion. Indeed, immediately *before* Judge Rhodes asked Mr. Ficker about the signature for the first time, he asked him how Mr. Palisano's name came to be in the motion. Mr. Ficker responded: "I called the hospital in Glen Burnie, and I said 'how can you say Palisano is in there when he's left the office?' And he said that's our boiler plate, and he didn't change the name after he talked to the person." Mr. Ficker's explanation that he was initially unaware that Mr. Kobin signed the motion simply does not make sense.

24

Rhodes that he was "100% confident" that someone in his office had spoken to Mr. Sauls "was unfounded and therefore knowingly false."[15]

*Mr. Kobin Takes the Blame*

On the day following the truncated proceeding in the Sauls case, Mr. Kobin sent a "Letter of Explanation/Apology" to Judge Rhodes. Mr. Kobin wrote that he had visited his doctor for a routine check-up on February 6, 2019. While he was there, the doctor discovered an issue and advised him not to leave the hospital because he would need to undergo an emergency amputation procedure. According to Mr. Kobin, he left the hospital against his doctor's advice and returned to Mr. Ficker's office to file continuance motions in several cases, including the Sauls matter. Mr. Kobin explained that he had used a template to generate the continuance motion and forgot to edit the appropriate fields. He wrote that "[a]lthough I believed (in error) that it was a consent motion, I have checked my notes which usually reveal the person who I spoke to and can find no evidence that I spoke to anyone for that client (Mr. Sauls)." Mr. Kobin further wrote that he had "been in a precarious financial situation and did not advise Mr. Ficker of the serious nature of my health."

---

[15] Mr. Ficker excepts to this finding. Before Judge Rhodes, Mr. Ficker said he was "100% confident" that someone in his office other than himself – *i.e.*, Mr. Kobin – had spoken to Mr. Sauls regarding the request for a continuance. In his exception, Mr. Ficker attempts to reframe the issue, stating that he was "100 percent confident that he and Mr. Kobin had made every reasonable effort to talk with Sauls." However, the question posed by Judge Rhodes was not whether Mr. Ficker had attempted to contact Mr. Sauls; it was whether anyone had spoken to him. We overrule this exception.

**Violations**

The hearing judge concluded that Mr. Ficker committed all of the violations charged by the Commission. Mr. Ficker excepts to those conclusions, which we review *de novo*. Maryland Rule 19-740(b)(1). We agree that Mr. Ficker's conduct violated numerous provisions of the MARPC as set forth below.[16]

## A.     *Failing to Meet Basic Standards*

The hearing judge concluded that Mr. Ficker violated the rules that require an attorney to act competently (Rule 1.1) and diligently (Rule 1.3) on behalf of a client.[17] In particular, the hearing judge determined that Mr. Ficker failed to act with the requisite diligence when he neglected to stay informed about the status of the Sauls case. The hearing judge found that Mr. Ficker fell short of the obligation to act competently (1) when he initially failed to appear in court on the morning of February 7, 2019 for the scheduled

---

[16] Because he violated the various rules as detailed in this section, Mr. Ficker also violated Rule 8.4(a), which simply states that it is a professional misconduct to violate the MARPC. No further discussion of that rule is necessary.

[17] Mr. Ficker excepts to the conclusion that he violated Rule 1.3, arguing that he acted diligently when he identified the scheduling conflict in advance and instructed Mr. Kobin to resolve it. While the violation of Rule 1.3 in this case is not as egregious as in some of Mr. Ficker's earlier cases where he lacked *any* internal system for managing his caseload, Mr. Ficker could not discharge his professional obligations by offloading them to Mr. Kobin without making any effort to ensure that the task delegated to his assistant had been carried out.

Mr. Ficker also excepts to the conclusion that he violated Rule 1.1 on the basis that he failed to appear because he had a "good faith belief" that the continuance had been granted in the Sauls case. The hearing judge rejected that contention and, as indicated earlier, his finding on that score is not clearly erroneous.

trial in the Sauls case and (2) when he ultimately appeared that afternoon but was "completely unprepared" to respond properly to questions about the continuance motion and his client's absence.

We agree with the hearing judge that there is clear and convincing evidence of these two violations. As Mr. Ficker himself should have been acutely aware, the obligation to act diligently includes "a duty on the part of counsel to keep informed about the status of a case in litigation." *Ficker II*, 349 Md. at 41. Competent representation "encompasses more than an attorney's legal knowledge, skill or preparedness" and also requires "the attorney's presence at any court proceeding for which he or she was retained, absent an acceptable explanation for that attorney's absence." *Attorney Grievance Comm'n v. Harris*, 366 Md. 376, 403 (2001). Moreover, "absent some compelling extenuating circumstance, it is ordinarily unacceptable for a lawyer to appear in court for a trial or other proceeding unprepared," and "doing so may constitute a violation of Rule 1.1." *Ficker II*, 349 Md. at 43; *see also Ficker I*, 319 Md. at 323.

## B.    *Dishonesty*

Rule 3.3(a)(1) (candor toward tribunal) provides that an attorney may not "knowingly … [m]ake a false statement of fact … to a tribunal or fail to correct a false statement of material fact … previously made to the tribunal by the attorney." A comment to the rule explains that "an assertion purporting to be on the attorney's own knowledge, as in an affidavit by the attorney or in a statement in open court, may properly be made only when the attorney knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Rule 3.3, Comment [3].

27

The hearing judge found that Mr. Ficker violated Rule 3.3(a)(1) in two ways: (1) he told Judge Rhodes that he had signed the continuance motion – an assertion that he knew to be false; and (2) he assured Judge Rhodes that someone in his office had contacted Mr. Sauls – an assertion for which he had no basis. The hearing judge additionally found that Mr. Ficker failed to correct the latter misrepresentation.

Rule 8.4(c) provides that an attorney may not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Rule 8.4(c) encompasses a "broad universe of mis-behavior." *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 39 (2014). As a rule addressing false statements, it overlaps Rule 3.3(a)(1), and a violation of one typically entails a violation of the other. *Attorney Grievance Comm'n v. Dore*, 433 Md. 685, 707 (2013).

The hearing judge concluded that Mr. Ficker violated Rule 8.4(c) in making knowingly false statements to Judge Rhodes regarding the signature on the continuance motion and his office's contacts with Mr. Sauls. Here again, Mr. Ficker excepts to this conclusion by arguing that we should accept his version of the facts rather than that found by the hearing judge – *i.e.*, that we should credit his contention that he did not knowingly misrepresent to Judge Rhodes that he had signed the continuance motion and that he had a "good faith belief" that he or someone in his office had contacted Mr. Sauls.

We earlier concluded that the hearing judge's findings of fact were not clearly erroneous. We therefore agree with the hearing judge that there was clear and convincing evidence that Mr. Ficker violated Rules 3.3(a)(1) and 8.4(c) when he made knowing

28

misrepresentations to Judge Rhodes and failed to correct those misrepresentations concerning the motion and the contact his office had with Mr. Sauls.[18]

## C.    *Responsibility for Conduct of Non-Lawyer Assistant*

The hearing judge also concluded that Mr. Ficker had fallen short of his obligation under Rule 5.3 to supervise his non-lawyer assistant – that is, Mr. Kobin, who was a disbarred former attorney.

*Inadequate Supervisory Procedures and Efforts – Rule 5.3(a)-(b)*

Rule 5.3(a) requires an attorney possessing managerial authority in a law office to implement procedures to ensure that a non-attorney assistant's work is consistent with the attorney's professional obligations. Rule 5.3(b) requires that an attorney who supervises a non-attorney assistant make reasonable efforts to ensure that the assistant's work is compatible with the professional obligations of the attorney. Consistent with this rule, "[a]n attorney must ascertain that his or her employees perform their responsibilities in a competent manner." *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 479 (1996). Rule 5.3(d)(A) places an even greater supervisory obligation upon a lawyer who employs a disbarred attorney, such as Mr. Kobin, by requiring that all law-related activities of the former attorney be conducted under the *direct* supervision of the supervising attorney in an office that is staffed by the supervising attorney full-time.

---

[18] The hearing judge concluded that Mr. Ficker also violated Rule 8.4(c) as a result of the statement in the continuance motion drafted by Mr. Kobin that Mr. Palisano had consented to the continuance – a statement that the hearing judge also found to be a violation of Rule 5.3(c) by Mr. Ficker. For the same reasons explained in the next section of this opinion concerning Rule 5.3(c), we sustain Mr. Ficker's exception to this conclusion.

The hearing judge found that Mr. Ficker violated his obligations under Rule 5.3(b) to ensure that Mr. Kobin's work was compatible with Mr. Ficker's own professional obligations when he permitted Mr. Kobin to sign motions that Mr. Ficker had never personally reviewed. The hearing judge noted that Mr. Ficker could make use of Mr. Kobin's assistance in contacting the State's Attorney's Office and drafting the simple continuance motion. However, the hearing judge found that Mr. Ficker's practice was at odds with his obligations under Maryland Rule 1-311. That rule provides that every pleading or paper filed in a case is to be signed by an attorney and that the signature is a "certification that the attorney has read the pleading or paper; that to the best of the attorney's knowledge, information, and belief there is good ground to support it; and that it is not interposed for improper purpose or delay."[19]

Mr. Ficker excepts to this conclusion and argues that he satisfied the obligations of Rule 5.3(b) by working closely alongside Mr. Kobin and asserts that "in almost all situations [he] reviewed and signed the pleadings leaving his office ... [he] had no reason

---

[19] A literal interpretation of Maryland Rule 1-311 would not allow a non-attorney to affix a signature to a filing, even if the responsible attorney had reviewed and approved the filing and authorized the non-attorney to sign the attorney's name. *See State v. Romulus*, 315 Md. 526 (1989); Paul V. Niemeyer & Linda M. Schuett, Maryland Rules Commentary (5th ed. 2019) at pp. 67-70. A perhaps more practical view, consistent with the purpose of the rule in an age of electronic communications and filing, would hold that "the ink marks that constitute the signature are not what is important," but rather that the attorney has read the filing, has concluded that there is good ground for it, and has approved it for filing. *Romulus*, 315 Md. at 540-43 (Adkins, J., concurring).

In this case, any debate about the appropriate interpretation of Maryland Rule 1-311 is academic. Mr. Ficker had not only not signed the continuance motion, but also had not reviewed or approved its content.

to question the accuracy of the work of his office manager. Mr. Kobin's mistake was an isolated incident caused by a serious medical emergency."

We agree with the hearing judge's conclusion that Mr. Ficker violated Rule 5.3(b). This Court has previously noted that "unsupervised delegation is … itself a violation" of the ethical rules. *Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 367 (2015). Mr. Ficker's explanation of his office procedures does not hold together. Mr. Ficker testified that he worked just feet away from Mr. Kobin and carefully supervised his work. Yet he acknowledged that he authorized Mr. Kobin to prepare and file continuance motions on his behalf with apparently little supervision. It is clear from the record that, when Mr. Ficker told Mr. Kobin to resolve the scheduling conflict that affected the Sauls trial, he considered it done and saw no need to personally review and sign the continuance motion. The issue is not, as Mr. Ficker frames it, that an unexpected medical emergency caused Mr. Kobin to file an inaccurate motion; the issue is that Mr. Ficker, in his role as Mr. Kobin's supervisor, did not have a procedure in place to identify and correct the error before the motion was filed in the District Court. Such unsupervised delegation is precisely the conduct proscribed by Rule 5.3(b).

*Ordering, Ratifying or Ignoring Subordinate Misconduct – Rule 5.3(c)*

Rule 5.3(c) specifies circumstances in which an attorney is responsible for conduct of a non-attorney that would be a violation of the disciplinary rules if engaged in by an attorney directly. That section of the rule provides:

> (c)  an attorney shall be responsible for conduct of such a person that would be a violation of the Maryland Attorneys' Rules of Professional Conduct if engaged in by an attorney if:

(1)  the attorney orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2)  the attorney is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

The hearing judge found that Mr. Ficker violated this rule. That conclusion was premised on the notion that Mr. Ficker authorized Mr. Kobin to resolve the scheduling conflict in the Sauls case and, because the motion that Mr. Kobin filed alleged consent by the State when in fact there was no consent, the filing of that motion would have been in violation of the ethical rules if it had been filed by an attorney.

In our view, there is not clear and convincing evidence that Mr. Ficker violated Rule 5.3(c) as he did not engage in the types of conduct specifically prohibited by that section of the rule. *See Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 378-79 (2015) (discussing the circumstances in which an attorney may be charged with misconduct of a non-attorney under Rule 5.3(c)). The hearing judge determined that Mr. Ficker violated Rule 5.3(c) because he "ordered the conduct involved" – apparently referring to the filing a continuance motion. However, the critical question as to subsection (c)(1) of the rule is whether Mr. Ficker ordered the *misconduct*. Mr. Ficker admits that he directed Mr. Kobin to draft and file the motion, but there does not appear to be any evidence in the record that Mr. Ficker ordered Mr. Kobin to file a consent motion without having contacted the State's Attorney's Office or that Mr. Ficker learned before the February 7 hearing that Mr. Kobin had done so and ratified that misconduct. Thus, subsection (c)(1) of the rule does not apply.

32

For subsection (c)(2) of the rule, the question is whether Mr. Ficker knew of Mr. Kobin's misconduct at a time when the consequences of that misconduct could have been avoided. There does not appear to be clear and convincing evidence in the record to support such a finding. Mr. Kobin testified before the hearing judge that, during his phone call with Mr. Ficker just prior to the February 7 proceeding, he admitted to Mr. Ficker that he had not talked to Mr. Palisano. However, Mr. Kobin maintained that he believed that he had obtained consent from another unremembered member of the State's Attorney's Office. It does not appear that on February 7 Mr. Ficker was aware – at least not aware from Mr. Kobin – that the assertion in the motion that someone in the prosecutor's office had assented to a continuance was false. Thus, subsection (c)(2) of the rule does not apply.

## D. *Conduct Prejudicial to the Administration of Justice*

Rule 8.4(d) provides that it is professional misconduct for an attorney to "engage in conduct that is prejudicial to the administration of justice." The hearing judge found that that Mr. Ficker violated Rule 8.4(d) based on: (1) Mr. Ficker's failure to appear for the Sauls trial; and (2) Mr. Ficker's intentional misrepresentations to Judge Rhodes. We agree.

An attorney can violate Rule 8.4(d) by being late or failing to appear for a scheduled court appearance. *See Ficker III*, 399 Md. at 452; *Ficker I*, 319 Md. at 315 (1990). Mr. Ficker was not present when the Sauls case was called on February 7, 2019, and he thus violated Rule 8.4(d).

In another sense, "[c]onduct prejudicial to the administration of justice is that which reflects negatively on the legal profession and sets a bad example for the public at large." *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 555-56 (2014). "An attorney

33

engages in conduct that is prejudicial to the administration of justice when an attorney makes repeated misrepresentations to a court or others." *Attorney Grievance Comm'n v. Trye*, 444 Md. 201, 223 (2015). In light of our conclusion that Mr. Ficker made repeated misrepresentations to the District Court, we conclude that he also violated Rule 8.4(d) in that respect.

## IV

## Sanction

As this Court has frequently stated, the sanction in an attorney disciplinary proceeding is intended to protect the public and the judicial system from an attorney who fails to satisfy standards of professional conduct, to deter similar misconduct by other attorneys, and to maintain public confidence in the legal system. In devising the appropriate sanction, we consider not only the misconduct itself, but also any aggravating or mitigating factors present in the particular case. In doing so, we refer to a list of factors identified by the American Bar Association. *See Attorney Grievance Comm'n v. Blatt*, 463 Md. 679, 707-08 n.19 (2019) (listing aggravating and mitigating factors).

*Aggravating and Mitigating Factors*

In accordance with Maryland Rule 19-727(e)(3), the hearing judge made findings as to aggravating and mitigating circumstances.

The hearing judge identified five aggravating factors. Mr. Ficker concedes, as he must, the existence of two of those aggravating factors – his *prior attorney discipline* and his *substantial experience in the practice of law*. He excepts to the hearing judge's findings

34

that he committed *multiple violations of the disciplinary rules,* that he has demonstrated a *pattern of misconduct*, and that there is a *likelihood of repetition of the misconduct*.

We overrule Mr. Ficker's exceptions to the aggravating factors. As indicated in the previous section of this opinion, Mr. Ficker's conduct on February 7, 2019 in the Sauls case resulted in violations of several ethical rules. Ordinarily, the *multiple violations* factor may be discounted when all of the violations in a particular case relate to one incident involving a single client. *Attorney Grievance Comm'n v. Yi*, 470 Md. 464, 500 (2020).

More importantly, however, in this case we cannot ignore that the current violations are simply the latest iteration of his past *pattern of misconduct* that portends a *likelihood of repetition of the misconduct*. As the hearing judge found, Mr. Ficker's "history of missing and failing to arrive punctually at court dates" was a continuation of a pattern that was likely to be repeated into the future. Mr. Ficker argues that he has "scrubbed" his motion templates to prevent repetition of the false statement in the continuance motion in the Sauls case. But this argument is of a piece with his past assurances to the Court of future reform. Whether or not the quality and accuracy of his motions have improved, a more pertinent question, as the hearing judge observed, is whether Mr. Ficker would continue to miss, or arrive late for, court proceedings. Moreover, however improved his templates may be, there remains the question of whether motions would be timely filed under his direct supervision and whether he would confirm that motions were granted and clients notified rather than continue to simply make convenient (for him) assumptions. Mr. Ficker's inability to manage a high-volume law practice is well-documented in the opinions of this Court.

35

The only mitigating factor found by the hearing judge was *remorse*, based on Mr. Ficker's apology during the disciplinary hearing. Bar Counsel has not excepted to this finding, and we are willing to accept that Mr. Ficker is sincere in his regret. Mr. Ficker has excepted to the hearing judge's failure to find the mitigating factor of *full and free disclosure to Bar Counsel*. Bar Counsel has not suggested otherwise, and we sustain Mr. Ficker's exception in this regard. But even one who is remorseful and cooperative must be held accountable.

Mr. Ficker further argues that he should be credited with the mitigating factor of *absence of a dishonest or selfish motive*. Mr. Ficker notes that he represented Mr. Sauls for a reduced rate and entered his appearance before Mr. Sauls paid him for handling the second case. However, his contentions in this regard are undermined by his misrepresentations to Judge Rhodes – which appeared to be an effort to conceal his failure to reform his ways – potentially to the detriment of a client. We overrule this exception.

Finally, Mr. Ficker also excepts to the hearing judge's failure to find the mitigating factor of *unlikelihood of repetition of the misconduct*. For the reasons stated in our discussion of the converse aggravating factor of *likelihood of repetition of the misconduct*, we overrule this exception.

*Discussion*

There is clear and convincing evidence that Mr. Ficker violated rules of professional conduct that require him to act competently and diligently on behalf of a client, to supervise adequately his non-lawyer assistant, to be candid with a court, to refrain from dishonesty and misrepresentations generally, and to avoid conduct prejudicial to the administration of

36

justice. As these violations appear to be re-runs of frequent past misconduct, the weight of these violations is severely aggravated.

Bar Counsel has proposed disbarment as the appropriate sanction. Mr. Ficker argues that a "warning" under Rule 19-715 would be the appropriate outcome – presumably after this Court either dismisses or remands the charges to the Commission.

Were this Mr. Ficker's first appearance before this Court in a disciplinary proceeding, perhaps a sanction less than disbarment might be considered. Even then, "disbarment is ordinarily the appropriate sanction for intentional dishonest conduct" such as the hearing judge found here. *Trye*, 444 Md. at 225. There is even less reason to deviate from that sanction given the aggravating circumstances of Mr. Ficker's long experience at the bar and his equally lengthy disciplinary history.

A common disclaimer in the securities trade is that past performance does not indicate future results. In our capacity as regulator of the legal profession, we have sometimes seen that past performance – in this context, professional misconduct – does indeed predict future results. In such a case, when sanctioning past misconduct, we must take prophylactic action to protect the public and the judicial system in the future. This is such a case.

For the reasons set forth above, disbarment is the appropriate sanction.

> **IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ROBIN KEITH ANNESLEY FICKER.**